**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE:<br><br>DLUBAK CORP.,<br><br>　　　　Debtor.<br><br>DLUBAK CORP.,<br><br>　　　　Movant,<br><br>v.<br><br>FIRST COMMONWEALTH BANK; FARMERS & MERCHANTS BANK OF WESTERN PENNSYLVANIA, N.A.; THE HUNTINGTON NATIONAL BANK; WELLS FARGO BANK, N.A.; NISSAN MOTOR ACCEPTANCE CORP., RYDER TRANSPORTATION SERVICES; MOTOR TRUCK PACLEASE; OFFICE OF THE UNITED STATES TRUSTEE,<br><br>　　　　Respondents. | Bankruptcy No. 13-70582-JAD<br><br>Chapter 11<br><br>Related to Doc. No. _____<br><br>**Hearing Date:**<br>**Hearing Time:**<br><br>**Response Date:** |

### EXPEDITED MOTION FOR AN ORDER APPROVING (A) BIDDING PROCEDURES FOR THE SALE OF ASSETS OF THE DEBTOR; (B) STALKING-HORSE BIDDER FEE RELATED TO THE SALE; (C) ASSUMPTION AND ASSIGNMENT PROCEDURES; AND (D) FORM AND MANNER OF SALE NOTICE

Dlubak Corporation ("Dlubak" or the "Debtor"), by and through its undersigned counsel, files the following Expedited Motion for an Order Approving (A) Bidding Procedures For the Sale of Assets of the Debtor, (B) Stalking-Horse Bidder Fee Related to the Sale, (C) Assumption and Assignment Procedures, and (D) Form and Manner of Sale Notice (the "Motion"), and in support hereof states as follows:

## JURISDICTION

1. On August 7, 2013 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code").

2. The Debtor remains in possession of its assets and is managing its business as a debtor-in-possession, pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

3. No creditors' committee has been appointed in this case by the United States Trustee. Further, no trustee or examiner has been requested or appointed.

4. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1134. This is a core proceeding pursuant to 28 U.S.C. §157(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

5. The Debtor is a private corporation engaged in the business of producing and selling specialty glass products. The Debtor's operations are conducted on an approx. 11 acre parcel (and over 100,000 square ft. building) owned by the Debtor located at 520 Chestnut Street, Blairsville, PA 15717, Indiana County, Pennsylvania. Due to a substantial decrease in sales in the 3 years prior to the petition filing (due to general economic conditions as well as an industry specific decline), the Debtor has exhausted its available operating capital and is in immediate need of funds. The Debtor has explored without success obtaining additional unsecured and/or secured funding, as well as the possibility of refinancing its current debt with its primary secured lender, First Commonwealth Bank (the "Bank"). The Debtor is now out of available liquid funds to operate its business.

6. The Debtor has determined in its business judgment that the only option for keeping the company as a going concern and saving the jobs of the majority of the company's employees is through a sale of the Debtor's assets to a strategic buyer. To that end, the Debtor engaged the services of Compass Financial Group in late May of 2013. The Debtor also entered into discussions with individuals and companies who might be logical buyers for the Debtor. As a result of these efforts, the Debtor has located a potential buyer for its assets.

7. After extensive prepetition marketing efforts, the Debtor received interest from Grey Mountain Partners, LLC ("Buyer" or "Stalking Horse Bidder"), a Delaware limited liability company that owns several companies in the glass manufacturing industry (the same industry as the Debtor), to purchase the substantially all of the Debtor's non-real estate assets.

8. As a result of lengthy negotiations, Buyer and the Debtor, in consult with Compass, agreed to a purchase price for the Assets (defined below) of Two Million Dollars ($2,000,000.00) (the "Purchase Price"). After consulting with its financial and legal advisors, it is the Debtor's business judgment that this offer represents a fair and reasonable offer for the Assets, as well as the only offer.

9. Thus, on August 8, 2013, the Debtor entered into a certain Asset Purchase Agreement (the "APA") with Buyer. (A copy of the APA is attached as Exhibit A to the Motion under § 363 to sell substantially all of the Debtor's Assets (defined below) filed concurrently herewith (the "Sale Motion").

10. Pursuant to the APA, Buyer has agreed to serve as the stalking horse bidder in the sale of the Assets.

11. The sale shall be free and clear of all Liens except the Permitted Encumbrances (as those terms are defined in the APA) pursuant to Bankruptcy Code § 363(f).

12. The APA contains several conditions to closing, one of which is that the Debtor obtain an Order approving this Motion (the "Bidding Procedures Order") on or before August 16, 2013. (See APA at § 5(b)).

13. In light of this condition, as well as the limitations on available funding for operations and the obligation to the Bank, the best interests of the Debtor's estate, creditors, employees and other parties-in-interest are served by the expedient marketing and sale of its Assets (as defined below) to the bidder making the highest and best offer.

14. By this Motion and the Sale Motion, the Debtor seeks to offer and sell its Assets to the highest and best offer.

15. The term "Assets" has the meaning set forth in the definition of "Acquired Assets" in the Section 2(a) of the APA and includes, without limitation, substantially all of the Debtor's non-real estate assets, such as (i) all assets necessary to operate the Debtor's business, (ii) all Equipment and Inventory (as those terms are defined in the APA), (iii) books and records, (iv) intellectual property rights of the Debtor, (v) all causes of action belonging to the Debtor, (vi) cash, cash equivalents and accounts receivable, (vii) goodwill and intangible assets, and (viii) all products in development.

16. The Debtor also owns certain real estate property upon which its business is located, which is not being sold pursuant to the APA. The Debtor intends to sell this real estate property to the Indiana County Development Corporation ("ICDC"). The Debtor expects that the ICDC will thereafter enter into a lease agreement with the successful Buyer.

17. By submitting its APA, Buyer has provided assistance to the Debtor in preserving the value of the estate and setting a floor for the purchase price obtained for the Assets.

18. Buyer would not go forward with the all the title and operational due diligence needed in this transaction without the Stalking-Horse Bidder Fee and bidding procedures proposed herein.

19. The Debtor believes that the Stalking-Horse Bidder Fee and Buyer's involvement will maximize the value of the Assets and lead to a sale process that benefits the estate and its creditors.

## RELIEF REQUESTED

20. By this Motion, the Debtor requests entry of the proposed order approving (A) bidding procedures for the sale of the Assets, (B) Stalking-Horse Bidder Fee related to the sale, (C) assumption and assignment procedures, and (D) form and manner of sale notice.

21. This Motion does not purport to constitute a motion or request by the Debtor for authority to sell the Assets to Buyer or a third party bidder pursuant to Section 363(f) of the Bankruptcy Code. That relief is sought pursuant to the Sale Motion. Rather, by this Motion, the Debtor seeks approval of the proposed bidding procedures set forth below (the "Bidding Procedures") to govern the process by which third parties may submit competitive bid(s) to purchase the Assets, by which such competitive bids will be evaluated, and by which the Auction (defined below) may be conducted, in order that the sale process may proceed in a uniform manner and within a controlled environment acceptable to all parties in interest.

22. The sale to the qualified bidder(s) with the highest or otherwise best bid(s) at the Auction, as contemplated herein, represents the best method to maximize the value of the Debtor's estate for the benefit of all of the Debtor's stakeholders, and accordingly, is in the best interests of the Debtor, its creditors, and the estate. The relief requested in this Motion therefore should be granted.

23. The Debtor requests that the Court schedule an expedited hearing on the instant motion. Cause exists for an expedited hearing because: (a) the APA requires the Debtor to request an expedited hearing, (b) the APA requires the Bidding Procedures Order to be entered on or before August 16, 2013 and the closing to occur on or before September 6, 2013, and (c) it is necessary for the Debtor to properly serve the Sale Motion and notice of the sale hearing well in advance of the sale hearing date.

### The Proposed Bidding Procedures

24. The Debtor requests that the Court approve the following Bidding Procedures, which shall govern the conduct of the sale of the Assets set forth in the APA, a true and correct copy of which is attached as **Exhibit A**.

25. The Proposed Bidding Procedures are as follows:

**Participation Requirements:**

(a) In order to be qualified to receive any confidential information from the Debtor, to submit an Initial Overbid (defined below) and to participate in the Auction (defined below), a potential bidder must submit each of the following to the Debtor on a timely basis:

(i) An executed confidentiality agreement which shall inure to the benefit of the Successful Bidder, in a form and substance acceptable to the Debtor and the Stalking Horse Bidder; and

(ii) Current audited financial statements and latest unaudited financial statements of the potential bidder or, if the potential bidder is an entity formed for the purpose of acquiring the Assets, current audited financial statements and latest unaudited financial statements of the equity holders or sponsors of the potential bidder who will guarantee the obligations of the potential bidder, or such other form of financial disclosure and/or credit-quality support or enhancement, if any, that will allow the Debtor to make a reasonable determination as to the potential bidder's financial and other capabilities to consummate the Sale.

(b) Based on the materials received by it, the Debtor shall determine whether any potential bidder that has timely submitted the materials referred to above qualifies to submit a bid (such qualifying potential bidder, an "Overbidder").

**Bid Requirements:**

(a) To participate at the Auction, an Overbidder must submit the following to the Debtor before the Bid Deadline (as defined below):

(i) a proposed asset purchase agreement (the "Competing APA"), executed by the Overbidder, that: (a) contains terms and conditions that are substantially the same as those in the APA, along with a redlined, marked copy showing all changes between the Competing APA and the APA; (b) provides for a purchase price to be paid to the Debtor that exceeds the sum of the Purchase Price by at least the amount of the Stalking-Horse Bidder Fee plus One-Hundred Thousand Dollars ($100,000) (such aggregate amount of the Purchase Price, the Stalking-Horse Bidder Fee and One-Hundred Thousand Dollars — *i.e.*, $2.3 million — the "Minimum Overbid"); (c) remains irrevocable until the earlier of the Closing or fifteen (15) days after entry of the Sale Order; (d) disclaims any right of Overbidder to receive a fee analogous to the Stalking-Horse Bidder Fee, any transaction or breakup fee, expense reimbursement or similar fee or payment or to compensation under Bankruptcy Code Section 503(b) for making a substantial contribution; (e) is not subject to or contingent upon the obtaining of financing; and (f) contains a proposed closing date that is not later than [September 6, 2013] (the "Outside Date");

(ii) wire transfer (to an escrow agent designated by the Debtor) or cashier's check made payable to the order of the Debtor in the amount of $100,000 (the "Overbidder's Deposit"), which will be retained by the Debtor as a nonrefundable good faith deposit for application against the purchase price at the closing of the transaction or returned to the Overbidder or otherwise applied as set forth in these Bidding Procedures;

(iii) admissible evidence in the form of affidavits or declarations establishing that the Overbidder has the financial ability to pay the purchase price set forth in the Competing APA; and

(iv) admissible evidence in the form of affidavits or declarations establishing the Overbidder's good faith, within the meaning of Section 363(m) of the Bankruptcy Code.

(b) A bid received from an Overbidder (and any bid submitted at the Auction by an Overbidder) that meets the requirements set forth above will be considered a "Qualified Bid" if, in the good faith opinion of the Debtor, (i) such bid is determined not to be materially more burdensome or conditional than the terms of the APA and (ii) the Debtor reasonably believes that such bid would be consummated before the Outside Date if selected as a Successful Bid (as defined below).

(c) Each bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Debtor and the Assets prior to making any bids; that it has relied solely upon its own independent review, investigation and/or inspection of the Assets in making its bid; and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Debtor and the Assets, or the completeness of any information provided in connection

therewith, except as expressly stated in these Bidding Procedures or, as to the Successful Bidder, the Competing APA with such Successful Bidder.

(d) Any entity that submits a Qualified Bid accompanied by all items required to be submitted along therewith in accordance with these Bidding Procedures shall each be deemed a "Qualified Overbidder" and may bid for the Assets at the Auction (defined below).

**Bid Deadline:**

(a) The deadline for submitting bids by an Overbidder shall be September 3, 2013 at 5:00 p.m. (Eastern Standard Time) (the "Bid Deadline").

(b) Before the Bid Deadline, an Overbidder that desires to make a bid shall deliver written copies of its bid via overnight mail and email to: (i) the Debtor, 520 Chestnut Street, Blairsville, PA 15717, Attn: Frank Dlubak; and (ii) counsel for the Debtor, The Law Office of Steven T. Shreve, 546 California Ave., Pittsburgh, PA 15202, Attn: Steven Shreve.

**Auction:**

(a) If no timely, conforming Qualified Bid from a Qualified Overbidder is received, the Debtor shall not conduct an Auction and shall request at the hearing to approve the Sale (the "Sale Hearing") that (i) the Bankruptcy Court approve the APA, including the Sale of the Assets (and the assignment of the Assumed Contracts, if any) to the Stalking Horse Bidder, and (ii) the Sale Order be immediately effective upon entry, notwithstanding the provisions of Rule 6004(h) of the Federal Rules of Bankruptcy Procedure;

(b) If one or more timely, conforming Qualified Bids from Qualified Overbidders are received, the Debtor shall conduct an auction of the Assets (the "Auction"), subject to Bankruptcy Court approval, in which the Stalking Horse Bidder and all other Qualified Overbidders may participate. The Auction shall be conducted at Courtroom D, 54th Floor, US Steel Tower, 600 Grant Street, Pittsburgh, PA 15219 on September 5, 2013 at _____ __.m. (Eastern Standard Time), or such other place and time as the Debtor may determine, so long as such change is communicated reasonably in advance to all Qualified Overbidders and other invitees, if any.

(c) The following procedures will govern the Auction:

(i) all Qualified Overbidders shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and to have waived any right to jury trial in connection with any disputes relating to the Auction or the Sale of the Assets;

(ii) each bid by a Qualified Overbidder shall be automatically reduced by an amount equal to the Stalking Horse Bidder Fee;

(iii) bidding will start at the amount of the highest bid submitted by a Qualified Overbidder, as determined by the Debtor, subject to approval by the Court;

(iv) each subsequent bid shall be in increments of no less than $100,000;

(v) the Stalking Horse Bidder shall have the right, but not the obligation, in its sole and absolute discretion, to match bids made by any other Qualified Overbidder (and such bids shall be disclosed to the Stalking Horse Bidder promptly by the Debtor) and, in such event, the Stalking Horse Bidder's matching bid shall be deemed the highest and best bid for the Assets;

(vi) immediately before concluding the Auction, the Debtor shall: (a) review each Qualified Bid for its financial and contractual terms and the factors relevant to the Sale process and the best interests of the Debtor's estate, its creditors and other parties-in-interest therein; and (b) determine and identify the highest or otherwise best Qualified Bid (the "Successful Bid") and the Qualified Overbidder (or the Stalking Horse Bidder) submitting such bid (the "Successful Bidder");

(vii) if, at the Auction's conclusion and consistent with the Bidding Procedures' terms, the Stalking Horse Bidder's final bid matches or is greater than the highest bid made by any Qualified Overbidder, such final bid shall be the Successful Bid, the Stalking Horse Bidder shall be the Successful Bidder and the Bankruptcy Court shall approve the APA, including the Sale of the Assets (including the assignment of the Assumed Contracts, if any) to the Stalking Horse Bidder, and authorize the Debtor to sell the Assets (including the assignment of the Assumed Contracts, if any) to the Stalking Horse Bidder, and the amount of the Stalking Horse Bidder's final bid shall constitute the Purchase Price under the APA; and

(viii) the Debtor may, with Bankruptcy Court approval, elect to deem the Stalking Horse Bidder's final bid to be the Successful Bid, notwithstanding the receipt of an apparently higher bid from a Qualified Overbidder, if the Debtor reasonably concludes that the Qualified Overbidder may not be able to close on a timely basis, or for any other reason.

(d) The Stalking Horse Bidder has standing and is deemed to be a party in interest with standing to be heard on any motion, hearing or other matter related to the APA or any bid or other sale of Assets subject to the APA.

**Sale Hearing:**

(a) The Sale Hearing will take place on or before September 5, 2013 at __.m. (Eastern Standard Time) in Courtroom D of the Honorable Jefferey A. Deller in the United States Bankruptcy Court for the Western District of Pennsylvania, U.S. Bankruptcy Court, 5414 U.S. Steel Tower, 600 Grant St., Pittsburgh, PA 15219, to

consider approval of the Sale to the Successful Bidder or to approve the APA if no Auction is held or the Stalking Horse Bidder is the Successful Bidder.

**Return of Overbidder's Deposit:**

(a)  Except as otherwise provided below with respect to any Successful Bidder, the Overbidder's Deposits of all Overbidders required to submit such a deposit under the Bidding Procedures shall be returned within three business days after the Auction concludes, or, if no Auction is held, within three days after the Sale Hearing.

(b)  If any sale to a Successful Bidder other than the Stalking Horse Bidder fails to close on or before the Outside Date, such Overbidder's Deposit shall be forfeited to, and retained by, the Debtor and applied as follows: *first*, to the Stalking Horse Bidder to pay the Stalking Horse Bidder Fee as provided in the APA; and *second*, as directed by order of the Bankruptcy Court.

26.  Courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales.  See, e.g., Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992); In re Financial News Network. Inc., 126 B.R. 152, 156 (S.D.N.Y. 1991).

27.  The Debtor has determined that the sale and assignment as described herein and according to the Bidding Procedures and the APA will enable the Debtor to obtain the highest and best offers for the Assets, will maximize the value of such property for the estate, and is in the best interests of the Debtor, its creditors and other parties in interest.  The Bidding Procedures allow for an interested party to appear and bid.  Under the circumstances, the Debtor contends that the Bidding Procedures to be employed will generate a fair and reasonable price for the Assets.

**The Stalking-Horse Bidder Fee Related to the Sale**

28.  In the event that (i) a competing offer is determined by the Debtor, subject to the Bankruptcy Court, to be the highest and best offer, and the Sale to a competing bidder (i.e., not Buyer) closes, or (ii) the APA is terminated at no fault of Buyer, then Buyer shall be entitled to a

break-up fee (the "Stalking-Horse Bidder Fee") of $200,000, to reimburse Buyer's expenditure of fees, expenses and costs, and the time, effort and risk taken in connection with the proposed sale and serving as the stalking horse bidder. Notwithstanding (i) any Liens held by the Bank or any other party over the assets of the Debtor, or (ii) any agreement, or order approving any agreement, with the Bank or any other party related to use of cash collateral, post-petition financing or granting senior liens or priority administrative expense claims, the Stalking-Horse Bidder Fee shall be entitled to priority as a superpriority administrative expense and paid at the time of Closing, without further order of the Court, from funds received from the Successful Bidder (defined below), in the event the Buyer is not the Successful Bidder. No Sale may be permitted to close with any Successful Bidder (other than Buyer) unless the Stalking-Horse Bidder Fee is paid at the time of Closing from funds received from the Successful Bidder.

29. All parties have proceeded diligently to consummate the proposed sale transaction and have acted in the best interest of creditors in doing so.

30. The proposed sale of the Assets has been negotiated at arms' length and all parties have acted in good faith and in the best interest of the creditors in doing so. The Debtor believes that Buyer is entitled to the protections of 11 U.S.C. §363(m), which protections shall be sought as part of the Sale Motion.

31. The Debtor submits that Buyer is entitled to such a Stalking-Horse Bidder Fee because competitive bidding is expected and the APA has provided value to the estate. The Stalking-Horse Bidder Fee sought by Buyer is in conformance with In re O'Brien Env. Energy, Inc., 181 F.3d 527, 536-37 (3d Cir. 1999), which states that such fees are appropriate where an actual benefit to the estate has been conferred and that they were necessary to preserve the value of the estate. Buyer, by agreeing to be the stalking horse bidder and by incurring the costs

related thereto, promoted a competitive bidding atmosphere that has and will provide a benefit to the estate. Without the prospect of the Stalking-Horse Bidder Fee, Buyer has informed the Debtor that it would not have entered into the APA or incurred expenses related thereto, nor would Buyer have an incentive to continue the sale process through closing.

32. To that end, the Stalking Horse Bidder Fee is reasonable because the costs and expenses that have been and will be incurred by Buyer in this process will likely match or exceed that amount. Moreover, the Bidding Procedures provide Buyer with assurances that the proposed sale will close or that it will be fairly compensated if another buyer is the winning bidder (i.e., the Stalking-Horse Bidder Fee). See 3 Collier on Bankruptcy, ¶ 363.02[7] at 363-21 (16th ed. 2012) ("[A] buyer may be reluctant to invest substantial sums in due diligence and purchase agreement negotiations unless it has some assurance that the trustee must either complete the sale or pay the buyer's expenses. Thus, it has become increasingly common for the buyer to demand a range of buyer protections.").

33. In O'Brien, the Court referred to nine factors in deciding whether to award a break-up fee: (1) the presence of self-dealing or manipulation in negotiating the break-up fee; (2) whether the fee harms, rather than encourages, bidding; (3) the reasonableness of the break-up fee relative to the purchase price; (4) whether the "unsuccessful bidder place[d] the estate property in a sales configuration mode to attract other bidders to the auction"; (5) the ability of the request for a break-up fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders"; (6) the correlation of the fee to a maximization of value of the debtor's estate; (7) the support of the principal secured creditors and creditor's committee of the break-up fee; (8) the benefits of the safeguards to the

debtor's estate; and (9) the "substantial adverse impact [of the break-up fee] on unsecured creditors, where such creditors are in opposition to the break-up fee." O'Brien, 181 F.3d at 536.

34. Whether evaluated under the "business judgment rule" applied by many courts or the Third Circuit's "administrative expense" standard, the Stalking-Horse Bidder Fee here should be approved because it is a necessary bidding incentive in order for the Debtor to obtain the maximum return for the benefit of the Debtor's estate.

35. The APA and the Stalking-Horse Bidder Fee are the product of extended good faith, arm's-length negotiations between the Debtor and Buyer. They are fair and reasonable in amount, particularly in view of Buyer's extensive efforts to date, the risk to Buyer of being used as a "stalking horse" bidder, and the benefits to the estate of having a stalking-horse, a definitive APA and a set floor to the purchase price. The Debtor's ability to seek a higher or better offer for the Assets, while maintaining a known purchaser in Buyer, would be eliminated if the Debtor were not authorized to pay the Stalking-Horse Bidder Fee in accordance with the terms of the APA.

36. The APA and Stalking-Horse Bidder Fee enables the Debtor to require competing bids for the Assets be higher or otherwise better than the purchase price under the APA, which is clearly a tangible benefit to the Debtor's estate. In addition, the amount of the Qualified Bid includes an incremental increase for the value of the Assets on top of the Stalking-Horse Bidder Fee. Thus, even if the Stalking-Horse Bidder Fee were to be paid, the Debtor will still have benefited from the higher purchase price for the Assets.

37. Moreover, the proposed Stalking-Horse Bidder Fee of to $200,000, or 10% of the Purchase Price, is entirely reasonable, especially considering that it includes reimbursement of costs and expenses that have been and will be incurred by Buyer, which will likely have matched

or exceeded the Stalking-Horse Bidder Fee.  <u>See e.g.</u>, <u>In re August Transport, Inc.</u>, Case No. 12-23022 (Bankr. W.D. Penn. August 17, 2012) (approving break-up fee equal to 7.7% of the purchase price); <u>Emivest Aerospace Corp.</u>, Case. No. 10-13391 (Bankr. D. Del. February 23, 2011) (approving break-up fee equal to 3% of cash purchase price, <u>plus</u> expense reimbursement); <u>In re Schutt Sports, Inc.</u>, Case No. 10-12795 (Bankr. D. Del. December 1, 2010) (break-up fee equal to approximately 3.2% approved, <u>plus</u> expense reimbursement); <u>In re Great Northern Paper, Inc.</u>, Case No. 03-10048 (Bankr. D. Me. February 18, 2003) (fee of 5.4% plus reimbursement of expenses upheld). In light of the benefit to the Debtor's estate that will be realized and its incentive to promote more competitive bidding, ample support exists for the approval of the Stalking-Horse Bidder Fee.

38. For the foregoing reasons, the Debtor requests that this Court approve the APA and authorize payment of the Stalking-Horse Bidder Fee on the terms set forth in the APA.

### The Proposed Assumption and Assignment Procedures

39. The Debtor is party to several executory contracts (hereinafter "<u>Contracts</u>") which Buyer may desire to have assigned to it as part of the Sale. Accordingly, to facilitate and effect the sale of the Assets to the Successful Bidder, should it include the assignment of any of the Debtor's Contracts, the Debtor seeks authorization to assume and assign the Contracts and pay any cure amounts in connection with the Sale.

40. In order to provide counterparties with adequate notice of such assumption and proposed adequate cure amounts (the "<u>Cure Amounts</u>"), the Debtor proposes the following procedures (the "<u>Assumption and Assignment Procedures</u>"):

(a) Within five (5) days after entry of the Bidding Procedures Order, the Debtor shall file a schedule of the Debtor's Contracts that may be assumed and assigned to the Successful Bidder (hereinafter "<u>Assigned Contracts</u>") and the amount, if any, that the Debtor contends is the amount needed to pay to cure any and all defaults with respect to such contracts. The Debtor will also file a schedule of cure amounts (collectively the

"Contracts and Cure Schedule"). Upon filing of the Contracts and Cure Schedule, a copy of the Contract and Cure Schedule will be served on each of the counterparties to the Assigned Contracts listed on the Contracts and Cure Schedule.

(b) Any objections ("Assignment Objections") to the assumption and assignment of any contracts listed on the Contracts and Cure Schedule, including, but not limited to, objections relating to the adequate assurance of future performance or to the cure amount set forth in the Contract and Cure Schedule must be filed with the Bankruptcy Court and served upon the Notice Parties on the date by which objections to the Sale Motion must be filed (the "Assignment Objection Deadline"), which date will be prior to the Sale Hearing.

(c) Any counterparty failing to file an Assignment Objection by the Assignment Objection Deadline shall be forever barred from: (i) objecting to the Cure Amount set forth on the Contract and Cure Schedule with respect to its Assigned Contract; (ii) seeking additional amounts arising under its Assigned Contract prior to the Closing from the Debtor or the Successful Bidder; and (iii) objecting to the assumption and assignment of its Assigned Contract to the Successful Bidder(s).

(d) Any Assignment Objection not consensually resolved prior to the Sale Hearing shall be heard at the Sale Hearing with any related Cure Amounts or adequate assurance of future performance being fixed by the Bankruptcy Court.

41. The Debtor believes that the proposed Assumption and Assignment Procedures will provide the counterparties to the Assumed Contracts a full and fair opportunity to be heard with respect to issues concerning Cure Amounts and the proposed assumption and assignment of the Assumed Contracts.

**Notice Procedures**

42. Under Fed. R. Bank. P. 2002(a) and (c), the Debtor is required to notify the creditors of the proposed sale of the Assets, including a disclosure of the time and place of the Auction, the terms and conditions of the sale, and the deadline for filing any objections. The Debtor requests notice of this Motion be deemed adequate and sufficient if:

(a) The Debtor serves, within three (3) business days (the "Mailing Deadline") after entry of the Order granting the relief requested herein by first class mail, postage prepaid, copies of the Bidding Procedures Order, the Motion and a notice of the Auction and Sale Hearing (the "Sale Notice"), substantially in the form attached hereto as **Exhibit B**, upon: (i) the United States Trustee for this District, (ii) Buyer, (iii) First Commonweath Bank (iv) all parties that are known to have asserted a security interest,

lien, or claim in the Assets, (v) all entities that may be parties to any of the Contracts, (vi) all applicable state and local taxing authorities and regulatory agencies, and (vii) all parties the Debtor has determined have demonstrated an interest in the Assets and financial capability sufficient to consummate a sale.

(b) On or before the Mailing Deadline, the Debtor will cause to be served by first-class mail, postage prepaid, the Order and Sale Notice upon all other known creditors and equity security holders.

(c) On or before the Mailing Deadline, the Debtor will cause the Sale Notice to be published as required by W.PA.LBR 6004-1, notice of the proposed sale shall be advertised in the Pittsburgh Post-Gazette and in the Pittsburgh Legal Journal no less than fourteen days before the sale. The sale will also be advertised on the Court's website.

WHEREFORE, the Debtor requests entry of an order, in substantially the same form as attached hereto, approving sale procedures for the sale of the Assets, approving the Stalking-Horse Bidder Fee, approving the Assumption and Assignment Procedures, and approving the form and manner of the Sale Notice and granting such other relief as the Court deems necessary and appropriate.

Dated: August 9, 2013                               Respectfully Submitted,

/s/ Steven T. Shreve
 Steven T. Shreve
546 California Avenue
Avalon, PA  15202
(412) 761-6110
PA Id. No. 59682
steveshreve@comcast.net