

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE:<br><br>DLUBAK CORP.,<br><br>     Debtor. | Bankruptcy No. 13-70582-JAD<br><br>Chapter 11 |
| DLUBAK CORP.,<br><br>     Movant,<br><br>v.<br><br>FIRST COMMONWEALTH BANK; FARMERS & MERCHANTS BANK OF WESTERN PENNSYLVANIA; THE HUNTINGTON NATIONAL BANK; WELLS FARGO BANK, N.A.; NISSAN MOTOR ACCEPTANCE CORP.; RYDER TRANSPORTATION SERVICES; MOTOR TRUCK PACLEASE; OFFICE OF THE UNITED STATES TRUSTEE;<br><br>     Respondents. | Related to Doc. No. 79<br><br>Doc. # 138 |

## ORDER APPROVING (I) THE SALE OF ASSETS; (II) THE ASSET PURCHASE AGREEMENT; AND (III) AUTHORIZING THE DEBTOR TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS

Upon consideration of the motion (the "Motion") by the above-captioned Debtor-In-Possession for entry of an order, pursuant to §§ 105(a), 363 and 365 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy procedures (the "Bankruptcy Rules") and Local Bankruptcy Rules 6004-1 and 9013-3(c), (i) authorizing the sale of Assets, as described in the APA (as defined below) (the "Assets"), free and clear of Respondents' liens, claims, encumbrances and interests, to Grey Mountain Partners Fund II, L.P., or its assignee or designee, (the "Buyer") as more fully set forth in the Asset Purchase Agreement, dated September 23, 2013, annexed hereto as **Exhibit**

A ("APA"), (ii) authorizing the Debtor to assume and assign certain executory contracts (the "Assumed Contracts"), and (ii) granting related relief and the Court having determined that the relief requested in the Motion is in the best interests of the Debtor, its estate, creditors, and other parties-in-interest; and due and adequate notice of the Motion having been given under the circumstances; and this Court having conducted a hearing and having entered an Order dated August 23, 2013 approving, *inter alia*, the Bidding Procedures; and a reasonable opportunity to object or be heard regarding the relief granted herein having been afforded to all parties-in-interest; and after due deliberations thereon, and good and sufficient cause appearing therefore, it is hereby

**FOUND AND DETERMINED THAT:**

A.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.[1]

B.    This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1134. This matter is a core proceeding pursuant to 28 U.S.C § 157(b)(2)(N). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    The statutory predicates for the relief sought in the Motion are §§ 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014.

D.    Due and adequate notice of the Motion, the Auction, the proposed Sale, the Sale Hearing and the assumption and assignment of the Assumed Contracts, and the subject matter thereof has been provided to all known parties-in-interest and non-debtor counterparties to the Assumed Contracts, and no other or further notice is necessary or shall be required. A reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities.

---

[1] To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

E.    The relief requested in the Motion is in the best interests of the Debtor, its estate, creditors, and other parties-in-interest. The Debtor has demonstrated good, sufficient, and sound business purposes and justifications for the relief requested in the Motion.

F.    After hearing in open court and active bidding, the Sale is approved to Grey Mountain Partners Fund II, L.P. for the following consideration:

    (a).    $ 3,250,000.00 paid by Buyer at Closing to the Debtor's estate;

    (b).    Buyer shall assume and be responsible for payment in the ordinary course of business of vacation pay owed to bargaining unit employees in the approximate amount of $130,000, consisting of accrued and unpaid vacation pay owed to employee union members; and

    (c).    The Buyer will make offers of employment to all bargaining unit employees on the same terms as the current collective bargaining agreement ("CBA"), with those employees on layoff or leave of absence remaining in such status. If a majority of Buyer's workforce at the Blairsville facility consists of the United Steelworkers' ("USW") members, Buyer shall recognize the USW and enter into an agreement with the USW extending the current CBA for a period of three-months following closing. Nothing herein shall waive the rights either party would otherwise have as of the extended expiration date of the CBA.

G.    The Sale was negotiated and proposed in good-faith, from arms-length bargaining positions, and without collusion. The Buyer is not an "insider" or an "affiliate" of the Debtor as those terms are defined in Bankruptcy Code § 101. The Buyer is a good-faith purchaser within the meaning of § 363(m) of the Bankruptcy Code and is entitled to the protection thereof. Neither the Debtor nor the Buyer has engaged in any conduct that would cause or permit the sale of the Assets to the Buyer pursuant thereto and hereto, to be avoided under § 363(n) of the Bankruptcy Code.

H.    Through a competitive sale process conducted in accordance with the Bidding Procedures, the Debtor afforded interested potential purchasers a full, fair and reasonable opportunity to qualify as bidders, participate in the Sale Hearing, and submit their highest or otherwise best offer to purchase the Assets.

I.    The Debtor: (1) has full corporate power and authority to execute the APA (as amended by this Order) and all other documents contemplated thereby, and the sale of the Assets by the Debtor has been duly and validly authorized by all necessary corporate action of the Debtor; (2) has all of the corporate power and authority necessary to consummate the transactions contemplated by the APA; and (3) has taken all corporate action necessary to authorize and approve the APA and the consummation by the Debtor of the transaction. No consents or approvals are required for the Debtor to consummate the transactions other than the approval of this Court and those set forth in the APA. Neither the execution of the APA nor the consummation of the transactions in accordance with its terms will constitute a violation of any provisions of the Debtor's organizational documents or any contract, instrument, law, regulation, or ordinance by which the Debtor is bound.

J.    Debtor is the legal and equitable owner of the Assets and upon entry of this Sale Order, it shall have full authority to consummate the transactions contemplated in the APA. The APA and the transactions have been duly and validly authorized by all necessary corporate actions, as the case may be, of the Debtor. The APA was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

K.    The transfer of the Assets to the Buyer shall be a legal, valid and effective transfer of the Assets and shall vest the Buyer at Closing with all right, title, and interest of the Debtor in and to the Assets, free and clear of all Respondents' claims (as defined in §101(5) of the Bankruptcy Code, "Claims"), Respondents' liens (as defined in §101(37) of the Bankruptcy Code, "Liens"), Respondents' encumbrances and all other interests of the Respondents (collectively including each of the foregoing, "Interests"), including, but not limited to: (1) those that purport to give to any party a right or option to effect any forfeiture, modification, preferential right to purchase, right of first refusal or termination of the Debtor's interest in the Assets, or any similar rights; (2) those relating to taxes arising under or out of in connection with, or in any way relating to the operation of the Assets prior to the Closing; and (3)(a) those

arising under all mortgages, deeds or trust, security interests, conditional sale or other title retention agreements, pledges, liens, judgments, demands, right of setoff or recoupment, encumbrances, rights of first refusal or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, and (b) all debts arising in any way in connection with any agreements, acts or failures to act of any of the Debtor or any of the Debtor's predecessors or affiliates; Claims, obligations, liabilities, rights of set off or recoupment, demands, guaranties, options, rights, contractual or other commitments, restrictions, interests and matters of any kind and nature, whether known or unknown, contingent or otherwise, whether arising prior to or subsequent to the commencement of these bankruptcy cases, and whether imposed by agreement, understanding, law, equity or otherwise to the greatest extent permitted by applicable law.

L.    The Debtor has exercised sound business judgment in deciding to sell the Assets to the Buyer and assume and assign the Assumed Contracts under sections 363(b) and 365 of the Bankruptcy Code. The Debtor will assume and assign to Buyer (and pay the contract arrears from the Sale proceeds) the executory contracts with Respondents **Nissan Motor Acceptance; Motor Truck PacLease, and SSI Technologies.** The executory contracts with **Ryder Transportation Services, Wells Fargo Equipment Finance** and **Hawkins Glass Wholesalers** are not being assigned to the Buyer and are hereby rejected.

M.    A fair and reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein as well as to the Sale has been afforded to all interested persons and entities.

N.    Respondents to this Motion include (i) the United States Trustee for this District, (ii) First Commonwealth Bank, (iii) all parties that are known to have asserted a security interest, lien, or claim in the Assets, and (iv) and all entities that may be parties to any of the Assumed Contracts.

O.    The Debtor may sell the Assets free and clear of all Respondents' Interests of any kind or nature whatsoever as contemplated by the APA because one or more of the standards set

forth in §§ 363(f)(1) through 363(f)(5) of the Bankruptcy Code have been satisfied. Those Respondents that did not object, or who withdrew their objections to the Motion or the Sale, are deemed to have consented pursuant to §§ 363(f)(2) and 365(c)(1) of the Bankruptcy Code. Those Respondents that did not object fall within one or more of the other subsections of § 363(f) of the Bankruptcy Code and are adequately protected by having their Interests, if any, attach to the net cash proceeds of the transactions ultimately attributable to the Assets against or in which they assert an Interest.

P.    With respect to the Respondents, the Buyer shall have no liability for any liability, Claim, or other obligations of or against the Debtor related to the Assets by reason of the transfer to the Buyer of the Assets. The Buyer shall not be deemed, as a result of any action taken in connection with the purchase of the Assets, to: (1) be a successor to the Debtor, or (2) have, *de facto* or otherwise, merged with or into the Debtor. The Buyer is not acquiring or assuming any liability, warranty, or other obligation of the Debtor, except as expressly set forth in the APA.

Q.    The APA (as modified by this Order) and ancillary agreements are valid and binding contracts between the Debtor and the Buyer, which are and shall be enforceable according to their terms, and with the same force and effect as this Sale Order. The Debtor and Buyer agree that the Current Asset Value target of $ 1,750,000 in the APA has been met. Buyer will only be entitled to credits against the purchase price based on post-auction, pre-closing accounts receivable collected by the Debtor's estate.

R.    All of the provisions of the APA (as modified by this Order) are nonseverable and mutually dependent.

S.    The requirements of sections 363(b), 363(f) and 365 of the Bankruptcy Code and any other applicable law relating to the Sale have been satisfied.

T.    The total consideration provided by the Buyer for the Assets, (i) is fair and reasonable; (ii) is the highest or otherwise best offer for the Assets; (iii) constitutes fair consideration and reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the

Bankruptcy Code) under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia; and (iv) will provide a greater recovery for the Debtor's creditors and other interested parties than would be provided by any other practically available alternative.

U.    The Debtor has articulated good and sound business reasons for waiving the stay otherwise imposed by Bankruptcy Rules 6004(h), 6006(d) and 7062.

V.    The Sale is or will be a legal, valid and effective transfer of the Assets to the Buyer vesting the Buyer with title to, and all other right, title and interest to the Assets on the closing of the Sale free and clear of any Interests or Claims of the Respondents pursuant to Bankruptcy Code §§ 105, 363(b), 363(f) and 1123(b).

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.    The Motion is granted it its entirety.

2.    All objections to the Motion or relief provided herein that have not been withdrawn, waived or settled, are hereby overruled and denied on the merits.

3.    Pursuant to §§ 105 and 363 of the Bankruptcy Code and the APA annexed hereto as **Exhibit A**, the sale of the Assets to the Buyer is **APPROVED**, the Debtor is hereby authorized to sell, transfer, and convey the Assets to the Buyer on the terms set forth in the APA (as modified by this Order) and together with executing and delivering all additional instruments and documents that may be reasonably necessary or desirable to implement the Sale and to take all further actions as may be reasonably requested by the Buyer for the purposes of assigning, transferring, granting, conveying and conferring to the Buyer or reducing to possession, the Assets, or as may be necessary or appropriate to the performance of the Debtor's obligations as contemplated by the APA (as modified by this Order), or as may be necessary to effectuate the terms of this Sale Order.

4.    The transfer of the Assets to the Buyer pursuant to the APA constitutes a legal, valid, and effective transfer of the Assets, and shall vest the Buyer with all right, title, and

interest of the Debtor in and to the Assets, free and clear of all Respondents' Interests of any kind or nature.

5.     Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Assets shall be transferred to Buyer, and upon the Closing shall be, free and clear of all Interests of the Respondents of any kind or nature whatsoever, and all such Interests of the Respondents of any kind or nature whatsoever shall attach to the net cash proceeds of the transactions in the order of their priority, with the same validity, force and effect that they now have as against the Assets, subject to any claims and defenses the Debtor may possess with respect thereto.

6.     At Closing, creditors with allowed lienholder interests will be paid from the net sale proceeds. Any claim in dispute shall be held in escrow by the Debtor pending further Order of Court.

7.     Except as expressly permitted otherwise by this Sale Order, all Respondents and parties-in-interest, including but not limited to, all debt security holders; equity security holders; governmental, tax, and regulatory authorities; lenders; trade creditors; and other creditors holding Interests of any kind or nature whatsoever against or in the Debtor or the Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated), arising under or out of, in connection with or in any way relating to the Debtor, the Assets, the operation of the Assets prior to the Closing or the transactions are forever barred, estopped and permanently enjoined from asserting against the Buyer, its successors or assigns, their property or the Assets such Respondents' Interests (including without limitation, any right of set-off or recoupment).

8.     The Sale Motion shall be deemed to provide sufficient notice as to the sale and assignment of the Assets free and clear of all Interests in accordance with Rule 6004-1(c) of the Local Bankruptcy Rules.

9.     The provisions of this Sale Order authorizing the sale of the Assets free and clear of Interests shall be self-executing, and neither the Debtor nor the Buyer shall be required to

execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the provisions of this Sale Order.

10.    Notwithstanding the foregoing, upon the Closing, to the extent Respondents are paid their secured claims, Respondents are authorized and directed forthwith to execute such documents and take all other actions as may be necessary to release its Interests in the Assets, if any, as such Interests may have been recorded or may otherwise exist.  The failure of any party to execute such documents shall in no way impair or affect the terms of this Order which provide for the transfer of the Assets free and clear of all Interests.

11.    If any Respondent that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing Interests in the Debtor of the Assets shall not have delivered to the Debtor prior to the Closing, in proper form for filing and executing by the appropriate parties, termination statements, instruments of satisfaction or releases of all Interests that the person or entity has with respect to the Debtor of the Assets or otherwise, then the Debtor is hereby authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of that Respondent with respect to the Debtor or the Assets.   To the extent neither the Respondents nor the Debtor does so, the Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which shall constitute conclusive evidence of the release of all Interests in the Debtor or the Assets of any kind or nature whatsoever.

12.    This Sale Order shall be binding upon and shall govern the acts of all entities, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Assets. A certified copy of this Sale Order may be filed with the appropriate clerk and/or recorded to act to cancel

any Interests. Each and every federal, state and local governmental agency, department, or unit is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA and this Sale Order.

13.     With respect to the Respondents, the Buyer shall have no liability or responsibility for any liability or other obligation of the Debtor arising under or related to the Assets.

14.     Except with respect to Assumed Contract liabilities expressly assumed in this Sale Order (if any), the Buyer shall have no liability or responsibility for any liability or other obligation of, or claim against, the Debtor arising under or related to the Assets or otherwise and, to the extent allowed by law, the Buyer (and its officers, managers, and members) shall not be liable for any other claims against the Debtor or any of their predecessors or affiliates, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtor or any obligations of the Debtor arising prior to the Closing Date. Consequently, all persons, governmental units (as defined in sections 101(41) and 101(27) of the Bankruptcy Code, respectively) and all holders of Interests, based upon or arising out of liabilities retained by the Debtor are hereby enjoined from taking any action against Buyer and the Assets, including asserting any setoff, right of subrogation or recoupment of any kind, to assert any Interest or to recover on account of any liabilities of the Debtor other than Assumed Contract liabilities expressly assumed in this Sale Order (if any). Upon Closing, the Debtor is deemed to release and forever discharge Buyer and any of its affiliates, successors and assigns from any and all claims, causes of action, obligations, liabilities, demands, losses, costs and expenses of any kind, character or nature whatsoever, known or unknown, fixed or contingent, relating to the Assets, the Sale, or the APA, except with respect to Assumed Contract liabilities expressly assumed in the APA or this Sale Order (if any).

15.     The transactions are undertaken by Buyer without collusion and in good-faith, in accordance with Bankruptcy Code sections 363(m) and 363(n). Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the transactions

under the APA shall not affect the validity of the sale of the APA, unless such authorization is duly stayed pending such appeal. Buyer is a good-faith purchaser of the Assets and is entitled to all of the benefits and protections afforded by Bankruptcy Code sections 363(m) and other applicable law. The Sale approved by this Sale Order is not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code.

16.    The Debtor and Buyer are hereby authorized and directed to comply with all provisions of the APA (as modified by this Order). The Debtor is hereby authorized and directed to assume and assign to Buyer the Assumed Contracts provided that the Debtor shall not be obligated to, and shall not, assume and assign to Buyer contract or other agreement not desired by Buyer in accordance with the APA or this Order.

17.    Any provision in any Assumed Contract that purports to declare a breach or default as a result of a change of control in respect of the Debtor, an assignment of such contract, the Debtor's financial condition, bankruptcy, or failure to perform any of its obligations under such contracts is unenforceable and no counterparty to any Assumed Contract shall be permitted to declare a default by or against the Debtor or Buyer under such contract or otherwise take any action against the Debtor or Buyer in connection with any of the foregoing.

18.    The Debtor and Buyer have provided adequate assurance of future performance under the Assumed Contracts, and the proposed assumption and assignment of the Assumed Contracts satisfies the requirements of the Bankruptcy Code. The Assumed Contracts, upon assumption by the Debtor and assignment to Buyer, shall be deemed valid and binding and in full force and effect and enforceable in accordance with their terms, subject only to the provisions of this Sale Order. Upon assignment of the Assumed Contracts to Buyer at or subsequent to the Closing, no default shall exist under any of the Assumed Contracts, the Debtor shall be deemed in compliance with all terms and provisions of the assigned Assumed Contracts and, pursuant to section 365(k) of the Bankruptcy Code, the Debtor shall be relieved from any further liability, except as provided herein and in the APA.

19.     Notwithstanding anything to the contrary in this Sale Order, no Assumed Contract will be assumed and assigned to Buyer until the Closing.

20.     This Court retains jurisdiction to:

(a).    Interpret, implement and enforce the terms and provisions of this Sale Order and the APA, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, with the APA and each of the other foregoing agreements to be enforced with the weight of this Sale Order, and resolve any disputes thereunder, except as otherwise provided therein;

(b).    Adjudicate all issues relating to Buyer successor liability;

(c).    Enter orders in aid or furtherance of the transactions contemplated by the APA;

(d).    Adjudicate all issues relating to any Liens or Interests in the Assets; and

(e).    Adjudicate any and all issues relating to the Assets, the proceeds of the transactions, the Sale Motion, and the APA.

21.     The APA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor or its estate.

22.     The failure specifically to include any particular provision of the APA in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the APA (as modified by this Order) is hereby authorized and approved in its entirety, as it may be amended or supplemented in accordance with its terms and this Sale Order.

23.     This Sale Order and the APA: (a) shall be binding in all respects upon the Respondents, the Buyer and all successors and assigns of the Buyer, the Debtor and its affiliates, the Assets, and any subsequent trustees appointed in this Chapter 11 case or related Chapter 11 cases or upon a conversion to Chapter 7 of the Bankruptcy Code; and (b) shall not be subject to rejection. Nothing contained in any Chapter 11 plan of reorganization or liquidation filed or

confirmed in this bankruptcy case or in any related confirmation order, disclosure statement, or order approving disclosure statement shall conflict with or derogate from the provisions of this Sale Order and the APA.

24.     The 14-day stay otherwise imposed by Bankruptcy Rules 6004(h), 6006(d) and 7062 is hereby waived, and this Sale Order shall be effective immediately upon entry.

25.     Pursuant to the Assignment and Assumption Procedures, any Assignment Objections or objections to the cure amounts owed are overruled.  The Debtor is further authorized to pay all cure amounts to the extent that any exist at Closing on any assumed contracts, as may have been modified by agreement or order.

26.     Upon Closing, Stalking Horse Bidder GGI Glass Distributors Corp., d/b/a General Glass International, shall be paid a break-up fee in the amount of $ 60,000 from the proceeds of sale.

27.     The sum of $ 26,000 of the Purchase Price shall be allocated to vehicles of the Debtor which are not subject to any lien in favor of any of the Respondents or any other party.

28.     If Buyer Grey Mountain Partners Fund II, L.P. fails to close on the Sale, the Debtor is authorized to engage in a sale with Oran Safety Glass in accordance with the terms of Oran Safety Glass' final bid at auction.

29.     The sum of $ 50,000 of the Purchase Price shall be paid into a separate escrow account for the Debtor to pay attorney fees and costs for Debtor's counsel and counsel for the Creditor's Committee, which account shall not be used without further Order of this Court.

30.     Farmers & Merchants Bank of Western Pennsylvania shall be paid in full from the sale proceeds its PMSI secured claims against the two vehicles and the 50 ton chiller.

IT IS SO ORDERED, this 25th day of September, 2013.

JEFFERY A. DELLER
CHIEF U.S. BANKRUPTCY JUDGE

FILED

SEP 25 2013

013167\0002\10745397.1                    13

CLERK, U.S. BANKRUPTCY COURT
WEST. DIST. OF PENNSYLVANIA

By:

United States Bankruptcy Court

ASSET PURCHASE AGREEMENT

by and between

DLUBAK CORPORATION

AS SELLER

and

GREY MOUNTAIN PARTNERS FUND II, L.P.

AS BUYER

Dated as of September 23, 2013

Exhibit "A"

# TABLE OF CONTENTS

Page

1.  Construction; Definitions .................................................................................................. 1

2.  Purchase and Sale ............................................................................................................. 6

3.  Purchase Price.................................................................................................................... 8

4.  Liabilities and Obligations ............................................................................................... 9

5.  Waiver of Certain Fees and Expenses. ............................................................................. 9

6.  Closing; Deliveries at Closing .......................................................................................... 9

7.  Representations and Warranties of Seller ...................................................................... 10

8.  Representations and Warranties of Buyer....................................................................... 13

9.  Additional Agreement of the Parties .............................................................................. 14

10. Conditions to Buyer's Obligation to Effect Closing ...................................................... 16

11. Conditions to Seller's Obligation to Effect Closing....................................................... 17

12. Termination; Effect of Termination ............................................................................... 17

13. Jurisdiction ..................................................................................................................... 18

14. Miscellaneous ................................................................................................................. 18

i

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), is dated as of September 23, 2013 by and between Dlubak Corporation, a Pennsylvania corporation ("Seller"), and Grey Mountain Partners Fund II, L.P., a Delaware limited partnership (and, except as otherwise provided herein, any assignee to whom Buyer's rights and obligations are transferred pursuant to Section 14(h), "Buyer").

## W I T N E S S E T H:

WHEREAS, Seller is engaged in the business of manufacturing security glass, flat glass, and bent glass laminates for military, security, architectural, residential and commercial applications (the "Business");

WHEREAS, on or about August 7, 2013 (the "Petition Date"), Seller filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (as defined below) with the United States Bankruptcy Court for the Western District of Pennsylvania (the "Bankruptcy Court") (collectively, the "Petition");

WHEREAS, Seller desires to sell to Buyer substantially all of the non-real estate assets used in the Business and to assign to Buyer certain executory contracts and unexpired leases relating to the Business, and Buyer desires to purchase from Seller such assets and assume such contracts and unexpired leases, upon the terms and subject to the conditions of this Agreement; and

WHEREAS, this Agreement constitutes a Competing APA as defined in the "Order Approving (A) Bidding Procedures for the Sale of Assets of the Debtor; (B) Break-Up Fee related to the Sale; and (C) Assumption and Assignment Procedures" entered by the Bankruptcy Court on August 23, 2013 (the "Bid Procedures Order") and satisfies each of the bid requirements set forth in Section 7 of such Bid Procedures Order.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants set forth herein, the parties agree as follows:

1.    **Construction; Definitions**

(a) Construction. For all purposes of this Agreement, except as otherwise expressly provided herein:

(i)    the terms defined in this Agreement include the plural as well as the singular;

(ii)    references to an "Article," "Section," "Schedule," "preamble," "recital," or any other subdivision are to an article, section, schedule, preamble, recital, or subdivision of this Agreement;

(iii)    all accounting terms not otherwise defined herein have the meanings assigned to them under GAAP (as defined below);

(iv)    pronouns of either gender or neuter shall include, as appropriate, the other pronoun forms;

(v)     the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular article, section, paragraph or other subdivision; and

(vi)     the words "include," "including" and other words of similar import mean "include, without limitation" or "including, without limitation," regardless of whether any reference to "without limitation" or words of similar import is made.

(b)   Definitions.  The following terms will, when used in this Agreement, have the following respective meanings:

"Acquired Assets" has the meaning assigned to that term in Section 2(a).

"Actual Current Asset Amount" has the meaning assigned to that term in Section 3(b)(ii).

"Agreement" means this Asset Purchase Agreement, including all schedules hereto, as the same may be amended or supplemented from time to time in accordance with the terms hereof.

"Assigned Contracts" means those Contracts that Seller shall assume and assign to Buyer, pursuant to Section 365 of the Bankruptcy Code, which are designated as "Assigned Contracts" on Schedule 7(d) (or identified in a separate schedule provided by Buyer to Seller at least one Business Day prior to the Closing Date as Contracts to be included as Assigned Contracts).

"Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. Section 101 et seq. commonly known as the Bankruptcy Code, as amended from time to time.

"Bankruptcy Court" has the meaning assigned to that term in the preamble to this Agreement.

"Bidding Procedures" has the meaning assigned to that term in Section 5(a)(ii).

"Bidding Procedures Order" has the meaning assigned to that term in Section 5(a)(ii).

"Business" has the meaning assigned to that term in the preamble to this Agreement.

"Business Day" means any day other than a Saturday, Sunday or other day on which the Bankruptcy Court is closed.

"Chapter 11 Case" means the voluntary case commenced in the Bankruptcy Court by Seller under Chapter 11 of the Bankruptcy Code.

"Closing" means the closing of the purchase and sale of the Acquired Assets pursuant to this Agreement.

"Closing Date" means the time and date of the Closing determined pursuant to Section 6.

"Company IP" means any Intellectual Property: (i) owned or licensed by Seller or otherwise held for use by Seller; or (ii) utilized in, necessary for, or incident to the conduct of the Business in any manner as currently conducted.

2

"Company Software" means all software owned or licensed by Seller, or utilized in the Business or necessary for the conduct of the Business as currently conducted.

"Contract" means any executory contract (as such term is used in Section 365 of the Bankruptcy Code) to which Seller is a party (i) as of the date hereof or (ii) which is entered into by Seller between the date hereof and the Closing Date in accordance with the terms of this Agreement that concerns or is related to the Business, including real and personal property leases, license agreements and agreements with employees, consultants, customers or agents.

"Cure Amounts" has the meaning assigned to that term in Section 7(d).

"Current Assets" has the meaning assigned to that term in Section 2(a)(xviii).

"Current Asset Deficiency" has the meaning assigned to that term in Section 3(b)(iii).

"Current Asset Target" has the meaning assigned to that term in Section 3(b)(i).

"Deposit" has the meaning assigned to that term in Section 9(l).

"Equipment" has the meaning assigned to that term in Section 2(a)(ii).

"Equity Security" means (i) any common, preferred, or other capital stock, limited liability company interest or unit, partnership, limited partnership or general partnership interest, or similar security; (ii) any warrants, options, or other rights to, directly or indirectly, acquire any security described in clause (i); (iii) any other security containing equity features or profit participation features; (iv) any security or instrument convertible or exchangeable directly or indirectly, with or without consideration, into or for any security described in clauses (i) through (iii) above or another similar security (including convertible notes); and (v) any security carrying any warrant or right to subscribe for or purchase any security described in clauses (i) through (iv) above or any similar security.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" has the meaning assigned to that term in Section 2(b).

"GAAP" means generally accepted accounting principles in the United States, consistently applied.

"Governmental Authority" means any government or any agency, bureau, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local, domestic or foreign.

"Hazardous Materials" means (a) any petroleum products or byproducts, radioactive materials, friable asbestos or polychlorinated biphenyls or (b) any waste, material, or substance defined as a "hazardous substance," "hazardous material," or "hazardous waste" or "pollutant" or otherwise regulated under any applicable Environmental Law (as defined in Section 7(l)).

"Intellectual Property" means all intellectual property rights throughout the world, including, without limitation, all United States, international and foreign (i) patents, patent rights, patent applications, patent disclosures and all related continuations, continuations-in-part, divisionals, reissues, re-examinations, substitutions, improvements and extensions thereof; (ii)

3

trademarks, service marks, trade names, trade dress, fictitious business names, logos, slogans, domain names, and registrations and applications for registration thereof, together with all goodwill appurtenant thereto; (iii) copyrights, copyrightable works and registrations and applications for registration thereof; (iv) mask works and registrations and applications for registration thereof; (v) computer software programs and applications in both source and object code forms and related documentation; (vi) sui generis database rights and other data necessary to operate the technology, (vii) trade secrets, know-how and confidential information, whether or not patentable and whether or not reduced to practice, including, without limitation, to the extent not publicly known or available: ideas, concepts, inventions, formulae, compositions, methods, processes, techniques, data, machines, devices, research and development information, designs, drawings, specifications, compounds, prototypes, programs, algorithms and software, (viii) all other proprietary rights relating to any of the foregoing (including, without limitation, associated goodwill and remedies against infringements thereof and rights of protection of an interest therein under the Laws of all jurisdictions); and (ix) all copies and tangible embodiments thereof.

"Inventory" has the meaning assigned to that term in Section 2(a)(iii).

"IP License(s)" shall mean all Contracts and any other permits, licenses, sublicenses or other agreements or permissions under which Seller has acquired, obtained, or been granted any license, permission or any other right to utilize or otherwise exploit any Intellectual Property, or has licensed, permitted or otherwise granted any right to any Person to utilize or otherwise exploit any Intellectual Property.

"IRC" means the Internal Revenue Code of 1986, as amended.

"Knowledge" means the actual knowledge of a Person and the knowledge that such Person could reasonably be expected to discover or otherwise become aware of in the course of performing such Person's duties.

"Laws" means all applicable laws (including common law), statutes, rules, regulations, codes, ordinances, decrees, proclamations or any requirement of any Governmental Authority.

"Liability" has the meaning assigned to that term in Section 4(a).

"Licensed IP" means Intellectual Property that is the subject of an IP License.

"Liens" means any mortgage, lien, pledge, covenant restriction, security interest, claim, charge, title defect, interest and other encumbrance.

"Loss" means any cost, damage, injury, expense, liability, loss, claim, deficiency or penalty of any kind or nature, including interest, penalties, and reasonable legal, accounting and other professional fees and expenses incurred in the investigation, collection, prosecution and defense of claims.

"Material Adverse Effect" means, other than the filing of the Petition and the effect thereof, a state of facts, event, change or effect with respect to the Business, the Acquired Assets, the customer base, or the enforceability of any Assigned Contract that results in or could reasonably be expected to result in a material adverse effect on or change in the results of operations, condition (financial or otherwise) or prospects of Sellers, the Acquired Assets or the Business, but excludes any state of facts, event, change or effect caused by events, changes or developments relating to (a) changes or conditions affecting the industries in which Sellers

4

operate generally; and (b) changes in economic, regulatory or political conditions generally; provided, in each case, that any such change does not have a disproportionate effect on Sellers, the Acquired Assets, or the Business taken as a whole.

"Order" means any decree, injunction, judgment, order, ruling or writ of any Governmental Authority.

"Ordinary Course of Business" means any action taken by a Person if that action: (i) is consistent in nature, scope and magnitude with the past practices of such Person and is taken in the ordinary course of the normal, day-to-day operations of such Person; and (ii) is not required to be authorized by the members, managers, partners, shareholders or board of directors, as applicable, of such Person, and does not require any other separate or special authorization of any nature.

"Permits" means licenses, permits, franchises, approvals, authorizations, certificates of authority, and orders, or any waiver of the foregoing, issued or issuable by any Governmental Authority.

"Permitted Encumbrances" means (i) Liens for current Taxes not yet due, (ii) interests of any lessors (in their capacity as such) in items constituting part of the Acquired Assets which are leased by Seller from such lessor, (iii) assessments, rights of way and other similar non-monetary Liens, (iv) mechanics' and materialman's Liens for amounts not yet due and payable, but only to the extent such liens secure Assumed Liabilities or amounts accruing after the Closing under Assigned Contracts, which do not, individually or in the aggregate, materially detract from the use or value of the Acquired Assets, and (v) the Liens set forth on Schedule 1.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, trust, association, unincorporated organization, other entity, or governmental body or subdivision, agency, commission or authority thereof.

"Petition" has the meaning assigned to that term in the preamble to this Agreement.

"Petition Date" has the meaning assigned to that term in the preamble to this Agreement.

"Purchase Price" has the meaning assigned to that term in Section 3(a).

"Real Estate Facilities" has the meaning assigned to that term in Section 9(f).

"Retained Obligations" has the meaning assigned to that term in Section 4(a).

"Sale Hearing" means a hearing conducted by the Bankruptcy Court to consider the approval of this Agreement and the transactions contemplated hereby.

"Sale Motion" means the sale motion to be filed by Seller with the Bankruptcy Court seeking, amongst other items, (i) approval of this Agreement and the sale by Seller to Buyer of the Acquired Assets pursuant hereto, (ii) confirmation that the sale of the Acquired Assets to Buyer, including the assignment of the Assigned Contracts, if any, shall be free and clear of all Liens other than the Permitted Encumbrances, and (iii) confirmation that Buyer is a purchaser of the Acquired Assets in "good faith" pursuant to Section 363(m) of the Bankruptcy Code, and the sale of the Acquired Assets is entitled to the protections of Section 363(m) of the Bankruptcy Code.

"Sale Order" means a final, nonappealable Order from the Bankruptcy Court, in form and substance reasonably acceptable to Buyer, approving the sale to Buyer of the Acquired Assets contemplated hereby under Sections 363(b), 363(f) and 365 of the Bankruptcy Code free and clear of all Liens other than the Permitted Encumbrances, waiving the 14-day stay imposed pursuant to Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure, and finding, among other things, that Buyer is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code.

"Taxes" means income, gross receipts, property, sales, use, license, excise, franchise, employment, social security, governmental pension or insurance, withholding or similar taxes or contributions, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

**2.    Purchase and Sale**

(a) The Acquired Assets.  Subject to the terms and conditions of this Agreement, to the extent not prohibited by applicable Law, and except as provided in Section 2(b), on the Closing Date, Seller shall sell, transfer, assign and deliver to Buyer, and Buyer shall purchase and acquire from Seller, all right, title and interest of Seller in and to all of the assets of Seller as of the Closing Date (other than the Excluded Assets), free and clear of Liens other than the Permitted Encumbrances, including the following assets (collectively, the "Acquired Assets"):

(i)    All assets of Seller necessary to operate the Business;

(ii)    All machinery, equipment, vehic les, furniture, furnishings, fixtures, operating equipment, supplies and tools, computer hardware and all parts, spares and accessories thereof and accessions thereto (collectively, the "Equipment");

(iii)    All inventories of the Business, including but not limited to work-in-progress, finished goods, merchandise, shipping materials, packaging materials, samples, business supplies and other consumables relating to the Business and maintained, held or stored by or for Seller in connection with the Business (collectively, the "Inventory");

(iv)    All books, records, files, invoices, Inventory records, product specifications, advertising materials, customer lists, supplier lists, business plans, catalogs, customer literature, quality control records and manuals, research and development files, data (including master files and transaction data for the previous three years), records and laboratory books and credit records of customers (including all data and other information stored on discs, tapes or other media) to the extent used in or to the extent relating to the assets, properties, including the Intellectual Property, business or operations of the Business;

(v)    All Company IP and any other of the Company's right, title or interest in or to all other forms of Intellectual Property;

(vi)    All customer, vendor and mailing lists of Seller, and existing telephone numbers, telecopier numbers, telex numbers and electronic mail addresses used by Seller;

(vii)    All outstanding orders for the purchase of goods or services by or from Seller;

6

(viii)   All invoices, bills of sale and other instruments and documents evidencing Seller's title to assets that are in the possession of Seller;

(ix)   All data processing systems, computer software, books, records, files, data bases, specifications, manuals and other papers and information of Seller (including any and all accounting books and records);

(x)   All stationery and other imprinted material and office supplies, and packaging and shipping materials of Seller;

(xi)   All rights of Seller under the Assigned Contracts;

(xii)   Prepaid interest and other prepaid items and deposits of Seller as of the Closing Date, and the leasehold improvements, prepaid rent and security deposits in respect of any lease assigned to Buyer pursuant to this Agreement;

(xiii)   To the extent transferable, all rights of Seller in respect of any insurance policies (including with respect to prepaid insurance and any refund of insurance premiums paid), except for any insurance policy expressly set forth in Section 2(b)(v);

(xiv)   All rights of recovery, rights of set-off, recoupment, claims and causes of action of Seller relating to the Business, whether known or unknown;

(xv)   All products (and all Intellectual Property contained therein, embodied thereby or related thereto) in development by Seller;

(xvi)   [Reserved];

(xvii)   All rights of Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors relating to the Business;

(xviii)   All cash, cash equivalents, accounts receivable and raw materials inventory of Seller (collectively, the "Current Assets");

(xix)   The goodwill and other intangible assets associated with the Business;

(xx)   To the extent transferrable and to the extent accepted by Buyer, all Permits, and pending applications therefor, used by Seller in the operation of the Business listed on Schedule 2(a)(xx);

(xxi)   To the extent not otherwise identified by items (i) – (xx) above, other assets of Seller described on Schedule 2(a)(xxi) 2(a)(xx); and

(xxii)   All other or additional privileges, rights and interests, associated with the Acquired Assets of every kind and description and wherever located that are used or intended for use in connection with, or that are necessary to the operation of, the Business.

(b)   Excluded Assets.  Notwithstanding anything to the contrary contained in this Agreement, the Acquired Assets do not include the following assets (the "Excluded Assets"):

7

(i)        Contracts not constituting Assigned Contracts;

(ii)       All real estate assets of Seller not enumerated as Acquired Assets in Section 2(a)(xi) and 2(a)(xii);

(iii)      To the extent not transferable, all rights of Seller in respect of any insurance policies (including with respect to prepaid insurance and any refund of insurance premiums paid);

(iv)      Any "employee benefit plan" (within the meaning of Section 3(3) of ERISA), and any assets relating to any such plan, which is or has been maintained or established by the Seller or to which the Seller contributes, has contributed, or has had any liability to contribute; and

(v)       The life insurance policy issued by Protective Life Insurance Company, Policy No. E00425122.

(c) _Assigned Contracts_.  At the Closing, Buyer shall acquire all right, title and interest of Seller in and to all of the Assigned Contracts.

**3.      Purchase Price**

(a) _Closing Payment_.  In connection with the purchase of the Acquired Assets hereunder, Buyer shall pay to Seller an amount equal to $3,250,000 (the "Purchase Price"), minus the Deposit set forth in Section 9(l), subject to adjustment in accordance with subsection (b) below.

(b) _Purchase Price Adjustment_.  The following provisions shall apply to adjust the Purchase Price based on the value of the Current Assets and Cure Amounts (as defined herein) at the Closing:

(i)        Schedule 3(b)(i) sets forth a detailed calculation of the anticipated value of the Current Assets at the Closing (the "Current Asset Target").

(ii)       On the Closing Date, or as close as practicable prior thereto, Buyer and Seller shall agree on the actual value of the Current Assets to be purchased by Buyer at the Closing (the "Actual Current Asset Amount").

(iii)      If, and to the extent, the Actual Current Asset Amount is less than the Current Asset Target (the "Current Asset Deficiency") or any Cure Amounts are payable under the Assigned Contracts, the Purchase Price shall be reduced by the amount of the Current Asset Deficiency and any Cure Amounts, as applicable, and Buyer shall, at the Closing, pay to Seller, by wire transfer of immediately available funds to such bank account designated in writing by Seller, an amount equal to the Purchase Price as so reduced.

(c) _Allocation of Purchase Price_.  Within 60 days following the Closing, Buyer will provide Seller with an allocation of the purchase price among the Acquired Assets in accordance with Section 1060 of the IRC.  Upon approval by Seller, which approval shall not be unreasonably withheld, such allocation shall be attached to this Agreement as Schedule 3(c).  In addition, Seller and Buyer hereby undertake and agree to file timely any information that may be required to be filed pursuant to Treasury Regulations promulgated under Section 1060(b) of the IRC.  Neither Seller nor Buyer shall file any tax

8

return or other document or otherwise take any position which is inconsistent with any allocation agreed upon by them.

**4.      Liabilities and Obligations**

(a) <u>Non-Assumption of Liabilities</u>.  Notwithstanding anything to the contrary contained herein or with respect to Cure Amounts under the Assigned Contracts, Buyer does not assume and shall have no responsibility or obligation whatsoever for any liabilities, commitments or obligations of Seller of any kind or nature whatsoever, known or unknown, accrued, fixed, contingent or otherwise, liquidated or unliquidated, choate or inchoate, due or to become due ("<u>Liabilities</u>") including any liabilities or obligations in respect of any liabilities associated with any Excluded Assets (collectively, the "<u>Retained Obligations</u>").

(b) <u>Rejection of Contracts</u>.  Seller shall reject, in accordance with the Bankruptcy Code in all material respects, any Contracts identified on <u>Schedule 7(d)</u> for rejection prior to the Closing Date (or which are otherwise determined not to be Assigned Contracts pursuant to the definition thereof). Buyer shall not be liable for any claims arising from the rejection or retention by Seller of such Contracts.

**5.      Waiver of Certain Fees and Expenses.**   With respect to Buyer's participation in the auction of the Acquired Assets conducted by the Bankruptcy Court on or about the date hereof and consummation of the purchase and sale of the Acquired Assets contemplated by this Agreement, Buyer hereby waives, and shall not seek approval from the Bankruptcy Court of, any fee analogous to a stalking-horse bidder fee, any transaction or breakup fee, expense reimbursement or similar fee, or any payment or compensation under Section 503(b) of the Bankruptcy Code for making a substantial contribution.

**6.      Closing; Deliveries at Closing**

(a) <u>Closing</u>.  If the Sale Order is entered, then, subject to the satisfaction or waiver by the parties of the conditions to their respective obligations to effect the Closing set forth in <u>Sections 10</u> and <u>11</u>, the Closing shall take place in a manner agreed by Buyer and Seller not later than two Business Days following: (i) the date that the Sale Order is entered if no objections to the Sale Motion were filed, or if any and all objections have been withdrawn, and no motion to stay has been filed, or (ii) in the event that an objection has been filed to the Sale Motion and not withdrawn, the date that the Sale Order becomes final and non-appealable and Closing is not otherwise stayed (in the appropriate case, the "<u>Closing Date</u>").

(b) <u>Deliveries by Seller</u>.  At the Closing, Seller shall deliver, or cause to be delivered (in addition to any other instruments required by <u>Section 10</u> or otherwise by this Agreement to be delivered by Seller at the Closing), to Buyer the following (in form and substance reasonably satisfactory to Buyer):

(i)      a duly executed bill of sale and assignment and assumption agreement, in form and substance reasonably satisfactory to Buyer, and such other bills of sale or other appropriate instruments transferring all right, title and interest in and to all of the Acquired Assets to Buyer;

(ii)      a certified copy of the Sale Order;

(iii)      possession of all of the Acquired Assets;

(iv)      evidence reasonably satisfactory to Buyer of compliance with the notice provisions set forth in the Sale Order;

(v)    evidence reasonably satisfactory to Buyer of the transfer or reissuance to Buyer of the Permits listed on Schedule 2(a)(xx) which Buyer indicates in writing no less than one Business Day prior to Closing that Buyer will accept; and

(vi)    such other instruments or documents as Buyer may reasonably request to fully effect the transfer of the Acquired Assets and to confer upon Buyer the benefits contemplated by this Agreement.

(c)    Deliveries by Buyer. At the Closing, Buyer shall deliver, or cause to be delivered (in addition to any other instruments required by Section 11 or otherwise by this Agreement to be delivered by Buyer at the Closing), to Seller, the following:

(i)    the Purchase Price payable in the manner described in Section 3; and

(ii)    a duly executed bill of sale and assignment and assumption agreement, in form and substance reasonably satisfactory to Seller.

7.    **Representations and Warranties of Seller**

Seller hereby represents and warrants to Buyer as follows:

(a)    Organization. Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Pennsylvania and has all necessary power and authority to own, lease and operate its properties and to conduct its business in the manner in which its business is currently being conducted.  Except for the commencement of the bankruptcy proceedings pursuant to the Petition, Seller is qualified to do business and is in good standing in all jurisdictions where it owns its properties and assets and conducts the Business.

(b)    Authorization. Seller has the power and authority to execute and deliver this Agreement and any other agreement contemplated by this Agreement and to sell Seller's assets, including the Acquired Assets; the execution, delivery and performance of this Agreement by Seller have been duly and validly authorized by all necessary action and proceedings and no further action or authorization is necessary on the part of Seller, any person or entity to whom Seller owes a fiduciary duty or any other third party in order to consummate the transactions contemplated herein; and this Agreement and the other documents executed by Seller in connection herewith are or will, when executed, be legal, valid and binding obligations of Seller, enforceable in accordance with their respective terms.

(c)    Consents and Approvals; Title to Acquired Assets.

(i)    Other than the entry of the Sale Order by the Bankruptcy Court, no consent, approval or authorization of, or declaration, filing or registration with, or notification to, any Governmental Authority is required in connection with the execution, delivery and performance of this Agreement or any ancillary agreement contemplated herein, the compliance by Seller with any of the provisions hereof or thereof,  the consummation of the transactions contemplated hereby or thereby or the assignment or conveyance of the Acquired Assets.  The execution, delivery and performance of this Agreement and any ancillary agreement contemplated herein, the consummation of the transactions contemplated hereby, the compliance by Seller with the provisions of this Agreement and such ancillary agreements and the assignment or conveyance of the Acquired Assets do not and will not result in the creation of any Lien or encumbrance upon the Acquired Assets or give rise to a right of payment,

10

termination, modification, acceleration or cancellation under any provisions of: (i) Seller's certificate of incorporation, bylaws or comparable organizational documents, (ii) subject to entry of the Sale Order, any Assigned Contract or Permit to which Seller is a party or by which any of the Acquired Assets are bound; or (iii) subject to the Sale Order, any applicable Laws.

(ii)    Sellers have good, valid, marketable and undivided title to the Acquired Assets free and clear of all Liens, claims, interests and encumbrances, other than Permitted Liens, and, subject to the entry of the Sale Order, Buyer will be vested, to the maximum extent permitted by Section 363 and 365 of the Bankruptcy Code, with good valid, marketable and undivided title to the Acquired Assets free and clear of all Liens, claims, interests and encumbrances, other than Permitted Liens.

(d)    Contracts.  Schedule 7(d) sets forth an accurate and complete list of all Contracts.  In the event Buyer identifies any Contracts not listed on Schedule 7(d) as executory contracts (as such term is used in Section 365 of the Bankruptcy Code), then Seller shall amend Schedule 7(d) to include such Contracts.  Upon the written request of Buyer, Seller shall provide Buyer with a list of all amounts required to cure all defaults under each of the Contracts designated by Buyer in such request, so as to permit the assumption and assignment of each such Contract pursuant to Section 365 of the Bankruptcy Code (the "Cure Amounts").  Buyer has received true, correct and complete copies of all Contracts and all non-executory contracts of Seller, including all amendments, modifications, supplements, exhibits and restatement thereto and thereof in effect as of the date of this Agreement and that will be in effect through the Closing Date.

(e)    Other Documents and Correspondence.  Buyer has received true, correct and complete copies of all material documents, notices, correspondence, filings, and books and records of the Seller, and has been provided access to all other true and complete data and information of Seller reasonably requested by Buyer, including, without limitation, any such data or information requested pursuant to Section 9(b).  All documents, notices, correspondence, filings, and books and records of the Seller that have been provided to Buyer including, without limitation, the Debtor's Schedules and Statement of Financial Affairs, are true and correct in all material respects.

(f)    Brokers; Agents.  No investment banker, broker, finder or similar agent has been employed by or on behalf of Seller in connection with this Agreement, and Seller has not entered into any agreement, arrangement or understanding of any kind with any Person for the payment of any brokerage commission, finder's fee or any similar compensation in connection with this Agreement.

(g)    Litigation.  Except as set forth on Schedule 7(g) or claims made in connection with Seller's Chapter 11 Case, there are no actions, claims, causes of action, proceedings, suits or investigations pending or, to the Knowledge of Seller, threatened, against Seller or the Business or any of Seller's assets, properties or rights, before or by any Governmental Authority.  Seller is not subject to any Order or settlement entered in any lawsuit or proceeding.

(h)    Adequacy of Assets.  Except for the Excluded Assets, the Acquired Assets constitute all of the assets and rights necessary to operate the Business as currently operated.

(i)    Compliance with Laws.  Seller (i) has complied with, is incompliance with and has operated the Business in compliance with all applicable Laws in all material respects, and (ii) holds all material Permits, concessions, grants, licenses, easements, variances, exemptions, consents orders, franchises, authorizations and approvals of all Governmental Authorities necessary for the lawful conduct of the Business and is in compliance with all of the foregoing in all material respects.

11

(j)  ERISA; Employee Benefits.  Except as set forth on Schedule 7(j):

(i)  Seller does not maintain and has not maintained, or contributed to, and has not had any and has no obligation to contribute to, any "employee benefit plan" (as defined in Section 3(3) of ERISA).  Seller has never maintained or contributed to any multiemployer pension plan (as defined in Section 3(37) of ERISA) or any defined benefit plan (as defined in Section 3(35) of ERISA) on behalf of current or former employees who performed services for the Business.  Such plans required to be listed on Schedule 7(j) are referred to herein as the "Plans."

(ii)  The Plans (and related trusts and insurance contracts) have been maintained, in all respects, with the requirements of applicable laws and regulations, including ERISA and the Code.  With respect to each Plan: (i) all employer and employee contributions or premiums due have been paid or otherwise deposited; (ii) no actions, investigations, suits or claims (other than routine claims for benefits) of any kind are pending or threatened, and Seller has no Knowledge of any facts which would give rise to or could reasonably be expected to give rise to any such actions, suits or claims; and, (iii) the transactions contemplated by this Agreement will not accelerate the time of payment or vesting of, or increase the amount of, or result in the loss of compensation or benefits under any Plan.

(iii)  Seller has no current or potential obligation to provide severance, retiree or post-employment benefits, other than as obligated under COBRA or any similar applicable law, which obligations Seller has met and agrees to retain.

(iv)  Excluding any Liability that has been satisfied in full, Seller has not incurred any Liability to any governmental agency, any multiemployer plan or otherwise with respect to any Plan.  No condition exists that presents a risk of a lien on any Purchased Assets as a result of any such Liability or other risk to Buyer of incurring such a Liability.

(k)  Taxes.

(i)  Except as set forth on Schedule 7(k), the Seller has timely filed all tax returns and all such tax returns were true and correct and complete in all material respects.  All Taxes owed by Seller (whether or not shown on any tax return) have been timely paid.  No claim has ever been made by a Governmental Authority in a jurisdiction where Seller does not file tax returns that such Seller is or may be subject to taxation by that jurisdiction.

(ii)  Except as set forth on Schedule 7(k), each Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party, and all IRS Forms W-2 and Forms 1099 (or any other applicable form) required with respect thereto have been properly and timely distributed and filed.

(iii)  Except as set forth on Schedule 7(k), there is no material dispute or claim concerning any Tax liability of Seller claimed or raised by any authority in writing or, to Seller's Knowledge, orally.

(l)  Environmental Matters.  Except as set forth in Schedule 7(l), (a) the Acquired Assets, and ordinary course operation of such assets, are in compliance with all applicable Laws, regulations, or other legal requirements relating to the protection of the environment or human health and safety as it

12

relates to Hazardous Materials ("Environmental Laws"); (b) Seller has not received written notice of any proceeding relating to or arising under Environmental Laws with respect to the Acquired Assets or the Business, nor are any of the same being threatened in writing against Seller; (c) Seller has not received any written notice of, or entered into, any obligation, order, settlement, judgment, injunction, or decree involving outstanding requirements relating to or arising under Environmental Laws; (d) Seller has not released, and there has been no release of any Hazardous Material into the environment at, onto, or from any property owned or leased by any Seller which would reasonably be expected to result in Liability, costs or claims relating to any Environmental Law; and (e) the transactions contemplated hereby will not result in any Liabilities for site investigation or cleanup, or require the consent of any Person, pursuant to any Environmental Laws, including any so-called "transaction-triggered" or "responsible property transfer" requirements.

(m) Accounts Receivable. Each accounts receivable that constitutes an Acquired Asset is a true and correct statement of the account for goods delivered to, or services actually performed for and accepted by, such account debtor. The accounts receivable in all material respects are current and to Seller's Knowledge are collectible in accordance with the terms thereof.

(n) No Undisclosed Risks or Liabilities. Except as set forth in Schedule 7(n), to Seller's knowledge there is no material fact or circumstance that could cause a Material Adverse Effect.

8.    **Representations and Warranties of Buyer**

Buyer represents and warrants to Seller as follows:

(a) Organization of Buyer; Authorization. Buyer is a limited partnership duly organized, validly existing and in good standing under the laws of the State of Delaware, and has the requisite organizational power and authority to execute and deliver this Agreement and to perform Buyer's obligations hereunder. The execution, delivery and performance of this Agreement have been duly authorized by all necessary organizational action of Buyer. This Agreement has been duly and validly executed by Buyer and, subject to the entering of the Sale Order by the Bankruptcy Court, constitutes a legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with the terms hereof.

(b) No Conflict as to Buyer. Neither the execution and delivery of this Agreement nor the consummation of any or all of the transactions contemplated hereby will (i) violate the certificate of formation or operating agreement (or other governing instrument) of Buyer; (ii) violate, be in conflict with, or constitute a default under, or require the consent of any third party (other than the Buyer's lender) to, any material contract or other agreement to which Buyer is a party; or (iii) to the Knowledge of Buyer, violate any statute, law or regulation of any Governmental Authority applicable to Buyer.

(c) Brokers; Agents. No investment banker, broker, finder or similar agent has been employed by or on behalf of Buyer in connection with this Agreement, and Buyer has not entered into any agreement, arrangement or understanding of any kind with any Person for the payment of any brokerage commission, finder's fee or any similar compensation in connection with this Agreement.

(d) Adequate Assurance Regarding Assigned Contracts. As of the Closing, Buyer shall be capable of satisfying Section 365(b)(1)(C) of the Bankruptcy Code with respect to the Assigned Contracts and shall supply reasonably sufficient information as required by the Bankruptcy Court or by agreement with the counterparties to such Assigned Contracts. Buyer shall take actions reasonably required to assist in obtaining a finding by the Bankruptcy Court in the Sale Order that Section 365(b)(1)(C) of the Bankruptcy Code has been satisfied with respect to the Assigned Contracts.

13

(e) Financial Ability. Buyer or its assignee have the financial means necessary to consummate the purchase of the Acquired Assets on the terms contemplated by this Agreement without obtaining any third party financing.

(f) Taxes. As of the date hereof, and with no independent investigation, Buyer has no actual knowledge of any substantial tax refund that will be paid or is payable to Seller after the Closing Date.

9.    **Additional Agreement of the Parties**

(a) Efforts.

(i)    Seller agrees to provide Buyer with copies of all motions, applications and supporting papers prepared by Seller (including forms of the Sale Motion and Sale Order and other orders and notices to interested parties) relating to Buyer, this Agreement or the Acquired Assets prior to the filing thereof in the Bankruptcy Court, consult with Buyer and Buyer's counsel with respect thereto, and incorporate therein such changes or additions as Buyer may reasonably request.

(ii)    Seller agrees to give appropriate notice, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders, hearings or other proceedings relating to this Agreement.

(iii)    Seller agrees to give prompt notice to Buyer, and Buyer shall give prompt notice to Seller, of (A) the occurrence, or failure to occur, of any event that would be likely to cause any representation or warranty contained in this Agreement to be untrue or inaccurate in any material respect at any time from the date of this Agreement to the Closing Date, and (B) any failure of Buyer or Seller, as the case may be, to comply with or satisfy, in any material respect, any covenant, condition or agreement to be complied with or satisfied by Buyer or Seller, as the case may be, under this Agreement.

(b) Access; Records; Bankruptcy Papers. Subject to the confidentiality agreement signed by Buyer and Seller, from and after the date hereof, authorized representatives of Buyer (including Buyer's accountants, advisors, potential financing sources, consultants and legal counsel) shall have the right, upon reasonable notice and at reasonable times, to inspect but not alter or change the Acquired Assets and their condition and shall be provided reasonable access to Seller's officers, advisors, counsel, trade vendors, customers, properties, and facilities. From and after the date hereof, Seller shall give Buyer and Buyer's authorized representatives, full access to Seller's books and records relating to the Business, as Buyer may reasonably request, permit Buyer to make inspections thereof, and cause Seller's officers and advisors to furnish Buyer with such financial, tax and other operating data and other information as Buyer may reasonably request. Seller hereby agrees that Seller will retain, until all appropriate statutes of limitations (including any extensions) expire, copies of all tax returns and supporting work schedules and other records or information which may be relevant to such tax returns, except for such tax returns, supporting work schedules and other records which Buyer shall acquire as a consequence of this Agreement (provided, that Seller may elect not to retain any such copies if Seller gives such copies or make such copies available to Buyer), and that Seller will not destroy or otherwise dispose of such materials without first providing Buyer with a reasonable opportunity to review and copy such materials. Buyer hereby agrees that Buyer will retain, until all appropriate statutes of limitations (including any extensions) expire, copies of all tax returns and supporting work schedules received from Seller pursuant to this Agreement and other records or information which may be relevant to such tax returns (provided, that Buyer may elect not to retain any such copies if Buyer gives such copies or makes

14

such copies available to Seller), and that Buyer will not destroy or otherwise dispose of such materials without first providing Seller with a reasonable opportunity to review and copy such materials. After the Closing Date, Buyer shall give Seller and Seller's authorized representatives or other duly appointed representative of Seller's bankruptcy estate pursuant to Section 323 of the Bankruptcy Code (the "Estate Representative") full access to the books and records acquired as a consequence of this Agreement for purposes of and relating to the prosecution of any claims and causes of action of Seller or which may be relevant to any claims objection process or which may otherwise be needed to enforce Seller's remaining rights and defend Seller's remaining obligations relating to the Acquired Assets and the Business or in connection with Seller's Chapter 11 Case, including any filings other than reporting required by the Bankruptcy Court or the Bankruptcy Code (the "Bankruptcy Case Matters"). For the purposes of this section, full access means the provision by Buyer to Seller of a reasonable opportunity to review and create photocopies or electronic copies of books and records actually received by Buyer as a consequence of this Agreement, provided, that (i) Buyer shall not be required to provide access to Seller without reasonable notice of a request for access or if Seller's request for access places a significant or unreasonable burden on Buyer in light of the continuing need to operate the Business and (ii) Buyer shall not be required to incur any expenses in complying with this section. Buyer shall give no less than 30 days' notice to the Estate Representative if Buyer intends to destroy any such documents so that the Estate Representative may take any actions reasonably necessary to preserve such documents. Seller will promptly deliver to Buyer copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers filed in Seller's Chapter 11 Case relating to this Agreement or the transactions contemplated hereby.

(c) Conduct of the Business. Prior to the Closing, Seller agrees to carry on the Business in the Ordinary Course of Business, including, but not limited to, (i) continuing the accounting methods of the Business consistent with past practice of the Business, (ii) using Seller's commercially reasonable efforts to preserve for Buyer the Business and the assets and business relationships of Seller, (iii) continuing to operate the billing and collection procedures of the Business, (iv) using Seller's commercially reasonable efforts to retain key employees of the Business, and (v) maintaining the business records of Seller in accordance with Seller's past practices. Seller agrees to immediately notify Buyer if there is a loss or expected loss or other disruption of any relationship between the Business and a vendor, customer or employee of the Business.

(d) Employee Notice. Prior to the Closing Date, Buyer and Seller agree to send a joint letter to Seller's employees informing such employees of the transactions contemplated by this Agreement.

(e) Working Capital Prior to the Closing, Seller agrees to use Seller's commercially reasonable efforts to ensure that Seller's current lender, First Commonwealth Bank, continues to provide necessary financing to Seller to permit Seller to the carry on the Business in the Ordinary Course of Business.

(f) Real Estate Leases. Prior to the Closing, Buyer and Seller agree to negotiate an agreement by Buyer to lease all of the real estate facilities that are currently owned by Seller and necessary for the conduct of the Business as currently conducted (the "Real Estate Facilities") for a monthly rental of $9,000.00 for a period of not less than five (5) years, with such additional terms reasonably acceptable to the Buyer and Seller (the "Facility Lease") and any mortgagee of the Facility Lease shall subordinate its mortgage(s) to the Facility Lease. If Seller sells or assigns its rights to the Real Estate Facilities prior to Closing, Seller agrees to condition such sale or assignment upon the purchaser of the Real Estate Facilities to assuming the Facility Lease in full.

15

(g) Plan. Seller covenants and agrees that if the Sale Order is entered, the terms of any plan of reorganization or liquidation submitted, supported or sponsored by Seller for confirmation shall not conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement and the rights of the Buyer hereunder unless expressly agreed to in writing by Buyer, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including any transaction that is approved pursuant to the Sale Order.

(h) Confidentiality. Prior to the Closing and thereafter, except to the extent required by applicable law (including the Bankruptcy Code) or court order, Buyer and Seller shall keep strictly confidential all documents and other communications and information whether written or oral, provided by the other prior to or after execution of this Agreement.

(i) Acknowledgment. Buyer acknowledges that, following the filing of the Motion, Seller may provide copies of this Agreement to third parties, in accordance with Seller's rights and duties under the Bankruptcy Code. This Agreement shall be an exhibit to the Motion.

(j) Employee Benefit Plans. Seller shall terminate either the employee benefit plans (within the meaning of Section 3(3) of ERISA) if the only participation therein is and has been by employees hired by Buyer or, if not, the interest of all employees hired by Buyer therein, and such termination shall be in accordance with any duties applicable to Seller under the Bankruptcy Code.

(k) TERMS OF SALE. EXCEPT AS OTHERWISE SPECIFICALLY SET FORTH IN THIS AGREEMENT, THE ACQUIRED ASSETS ARE BEING SOLD TO BUYER ON AN "AS-IS, WHERE IS" BASIS, WITHOUT WARRANTY. SELLER HEREBY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. BUYER HEREBY ACKNOWLEDGES AND AGREES THAT BUYER, AND BUYER'S SUCCESSORS AND ASSIGNS, SHALL BEAR ALL RISKS OF INJURY OR DAMAGE TO PERSONS OR PROPERTY TO THE EXTENT RELATING TO THE USE OR OPERATION OF THE ACQUIRED ASSETS ON AND AFTER THE CLOSING DATE.

(l) Deposit. Concurrently with the execution of this Agreement, Buyer shall deposit to an escrow agent mutually agreeable to Buyer and Seller, a good faith deposit in the amount of One Hundred Thousand Dollars ($100,000) (the "Deposit"). The Deposit shall be refundable in the event that (i) the Buyer terminates this Agreement in good faith in accordance with Buyer's rights under Section 12(a)(i) or (ii) the Sale Order is not approved or is appealed and Closing does not occur as a result. The Deposit shall be non-refundable in the event that (i) Buyer terminates this Agreement other than as permitted by Section 12(a)(i), 12(a)(iii) or 12(a)(iv), or (ii) Buyer refuses to effect the Closing despite the timely satisfaction of all of Buyer's conditions to Closing set forth in Section 10. Seller and Buyer agree that (i) Seller's damages for Buyer's breach are limited to the recovery of the Deposit and (ii) the Deposit is a reasonable approximation of the actual damages that would arise in such a circumstance, given that it is impractical or extremely difficult to establish the amount of damages that would be actually suffered by Seller in the event Buyer were to breach this Agreement.

**10.     Conditions to Buyer's Obligation to Effect Closing**

The obligation of Buyer to effect the Closing shall be subject to the satisfaction, on or before the Closing Date, of the following conditions, any one or more of which may be waived by Buyer:

(a) Representations and Warranties and Covenants. (i) The representations and warranties of Seller set forth in this Agreement shall be true and correct in all respects as of the date of

16

this Agreement and as of the Closing Date, (ii) Seller shall have performed and complied in all material respects with the agreements contained in this Agreement required to be performed and complied with by Seller on or before the Closing, and (iii) Seller shall have delivered to Buyer at the Closing certificates, to be prepared by Buyer, dated the Closing Date, signed by Seller certifying as to compliance with clauses (i) and (ii) above.

(b) <u>Effectiveness of Sale Order</u>. The Bankruptcy Court shall have entered the Sale Order, in form and substance reasonably acceptable to Buyer and the Sale Order shall not have been stayed and shall not have been appealed, amended, modified, reversed or vacated.

(c) <u>Assumption and Rejection of Contracts</u>. Seller shall have filed a motion seeking an Order of the Bankruptcy Court for the assumption or rejection of the Contracts as designated hereunder, satisfactory to Buyer.

(d) <u>Employees</u>. Buyer shall have entered into an agreement, on terms reasonably acceptable to Buyer, with at least that number of Seller's employees, or the labor union representing such number of employees, that, to the reasonable satisfaction of Buyer, is sufficient to operate the Business.

(e) <u>Collective Bargaining Agreement</u>. Seller and United Steelworkers of America (Union) shall have amended the current Collective Bargaining Agreement to include terms and conditions reasonably acceptable to Buyer. Such amendment shall inure to the benefit of Buyer. In the event Buyer waives this condition, Buyer shall have no obligations with respect to the current Collective Bargaining Agreement, and shall be free to implement initial terms and conditions of employment.

(f) <u>Real Estate Leases</u>. Pursuant to the negotiations set forth in Section 9(f), Buyer shall have entered into an agreement, on terms acceptable to Buyer, in Buyer's sole discretion, to lease or purchase each of the Real Estate Facilities from Seller or any purchaser of the Real Estate Facilities, as the case may be.

(g) <u>Material Adverse Effect</u>. There shall not have occurred a Material Adverse Effect.

## 11. Conditions to Seller's Obligation to Effect Closing

The obligation of Seller to effect the Closing shall be subject to the satisfaction, on or before the Closing Date, of the following conditions, any one or more of which may be waived by Seller:

(a) <u>Representations and Warranties</u>. (i) The representations and warranties of Buyer set forth in this Agreement shall be true and correct in all respects as of the date of this Agreement and as of the Closing Date, and (ii) Buyer shall have performed and complied in all material respects with the agreements contained in this Agreement required to be performed and complied with by Buyer on or before the Closing.

(b) <u>Effectiveness of Sale Order</u>. The Bankruptcy Court shall have entered the Sale Order.

## 12. Termination; Effect of Termination

(a) <u>Termination</u>. This Agreement may be terminated before the Closing occurs only as follows:

17

(i)    by Buyer, if (A) the conditions set forth in <u>Section 10</u> shall not have been satisfied or waived on or before October 14, 2013, (B) Buyer reasonably determines that the timely satisfaction of any conditions set forth in <u>Section 10</u> will not occur, (C) Seller has breached any material representation or warranty; or (D) Seller has breached any material covenant or obligation contained in this Agreement and such breach shall not have been cured within 3 days after the delivery of written notice thereof to Seller (in each case, other than as a result of any failure on the part of Buyer to comply with or perform its covenants and obligations set forth in this Agreement);

(ii)    by Seller, if (A) the conditions set forth in <u>Section 11</u> shall not have been satisfied or waived on or before October 14, 2013, (B) if Seller reasonably determines that the timely satisfaction of any condition set forth in <u>Section 11</u> will not occur, or (C) Buyer has breached any material covenant or obligation contained in this Agreement and such breach shall not have been cured within 3 days after the delivery of written notice thereof to Buyer (other than as a result of any failure on the part of Seller to comply with or perform its covenants and obligations set forth in this Agreement);

(iii)    by either party, if the Sale Order has not been entered by September 27, 2013, or if, on or prior to such date, the Bankruptcy Court approves another transaction involving the sale or other transfer of any of the Acquired Assets to a third party; or

(iv)    by the mutual written agreement of Buyer and Seller.

(b)  <u>No Further Liability</u>.  If this Agreement is terminated by either or both of Seller and Buyer pursuant to this <u>Section 12</u>, neither party shall have any further obligation or liability under this Agreement, except that the provisions of <u>Sections 9(h)</u>, <u>12</u>, <u>13</u> and <u>14</u> shall survive and any party that has materially breached this Agreement shall not be relieved of any liability hereunder.

## 13.    Jurisdiction

The parties agree that the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach hereof.

## 14.    Miscellaneous

(a)  <u>Notices</u>.  All notices, requests, demands, consents and other communications required or permitted under this Agreement shall be in writing and shall be considered to have been duly delivered when (i) delivered by hand, (ii) sent by telecopier (with receipt confirmed), <u>provided,</u> that a copy is mailed (on the same date) by certified or registered mail, return receipt requested, postage prepaid, or (iii) received by the addressee, if sent by Express Mail, Federal Express or other express delivery service (receipt requested), in each case to the appropriate addresses and telecopier numbers set forth below (or to such other addresses and telecopier numbers as a party may from time to time designate as to itself by notice similarly delivered to the other party in accordance herewith).  A notice of change of address shall not be deemed delivered until received by the addressee.

If to Buyer, to:

Grey Mountain Partners Fund II, L.P.
1470 Walnut Street, Suite 400
Boulder, CO 80302
Fax No.: (303) 449-3194
Attention:  Jeff Vincent
            Will Pucillo


       With copies (which shall not constitute notice) to:


       Kendall, Koenig & Oelsner, PC
       2060 Broadway, Suite 200
       Boulder, CO 80302
       Fax No.: (303) 672-0101
       Attention:  Carlos Cruz-Abrams, Esq.

       and

       Brownstein Hyatt Farber Schreck
       410 Seventeenth Street, Suite 2200
       Denver, CO 80202-4432
Attention:  Joshua Hantman, Esq.


If to Seller, to:

Dlubak Corporation
520 Chestnut Street
Blairsville, PA 15717
Fax No.:  (724) 459-0866
Attention:  Frank Dlubak

       With a copy (which shall not constitute notice) to:

       The Law Office of Steven T. Shreve
       546 California Ave.,
       Pittsburgh, PA 15202
       Fax No.:  (412) 761-9236
       Attention: Steven Shreve, Esq.

       (b)  Press Releases; Disclosure.  The parties hereto will cooperate in the issuance of any
press releases or otherwise in making any public statements with respect to this Agreement and the
transactions contemplated hereby.  Neither Buyer nor Seller shall issue any press release regarding this
Agreement or the transactions contemplated hereby without the other party's prior written consent, which
consent shall not be unreasonably withheld.  Buyer acknowledges and agrees that Seller may provide
copies of this Agreement to the parties in interest in Seller's Chapter 11 Case, and those parties Seller
determines it is necessary to provide copies to in connection with Seller's Chapter 11 Case.  Seller also

19

shall be entitled to file copies of this Agreement with the Bankruptcy Court or as otherwise required by law.

(c) <u>Entire Agreement</u>. This Agreement and the instruments, agreements, and other documents contemplated hereby supersede all prior discussions and agreements between the parties with respect to the matters contained herein, and this Agreement and the instruments, agreements and other documents contemplated hereby contain the entire agreement between the parties hereto with respect to the transactions contemplated hereby.

(d) <u>Further Assurances</u>. After the Closing, each of the parties hereto shall, at the reasonable request of the other party hereto, execute and deliver such other instruments of transfer or assumption and further documents and agreements, and do such further acts and things as may be necessary to carry out the provisions of this Agreement.

(e) <u>Waiver</u>. Any term or condition of this Agreement may be waived at any time by the party thereto which is entitled to the benefit thereof, but such waiver shall only be effective if evidenced by a writing signed by such party. A waiver on one occasion shall not be deemed to be a waiver of the same of any other breach on a future occasion.

(f) <u>Amendment</u>. Except as otherwise expressly provided herein, this Agreement may be amended only by a writing signed by all the parties hereto.

(g) <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

(h) <u>Binding Agreement; Assignment; No Third Party Beneficiaries</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. This Agreement may not be assigned by any party hereto without the prior written consent of the other party, and any purported assignment without such consent shall be void; <u>provided, however</u>, that notwithstanding the above, Buyer may, by written notice delivered to Seller not less than the Business Day prior to the Closing Date, designate one or more of Buyer's affiliates (including, without limitation, a new special purpose entity with additional investors) to assume all of the obligations and rights of Buyer hereunder effective as of the Closing Date. This Agreement is not made for the benefit of any third party (including any non-Seller parties to the Assigned Contracts), and no third party shall be deemed to be a beneficiary hereof.

(i) <u>Governing Law</u>. This Agreement shall be governed by the laws of the State of Delaware, without regard to the conflict of laws principles thereof.

(j) <u>Headings</u>. The headings in this Agreement are for convenience of reference only and should not be deemed a part of this Agreement.

(k) <u>Expenses</u>. Except as otherwise expressly provided herein, each of the parties hereto shall pay their own fees and expenses in connection with the negotiation, preparation, execution and delivery of this Agreement and the other instruments and agreements entered into pursuant to this Agreement, and any amendments to the same.

(l) <u>Liability of Owners, Officers, Directors of Buyer</u>. No manager, member, shareholder officer, employee, or director of Buyer shall have any liability whatsoever for the obligations of Buyer under this Agreement.

(m) <u>Records</u>. Seller may copy and maintain any records that Seller believes are necessary. In the event Seller does not retain copies of such records and insofar as Seller reasonably believes the records may be needed or useful in connection with federal, state or local regulatory or tax matters, resolution of disputes, litigation, or contract compliance issues, to the extent that Buyer has maintained such records, Buyer will give Seller access to such records and Seller shall have the right to copy and review at Seller's own expense those records that Buyer has available upon reasonable request from Seller to Buyer.

[Signatures on Next Page]

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed on the date first above written.

**BUYER:**

GREY MOUNTAIN PARTNERS FUND II, L.P.

By: Grey Mountain P:artners Fund II GP, L.P.,

its General Partner

By: Grey Mountain Partners Fund II GP, LLC,

its General Partner

By: _____

Name:    Jeff Vincent

Title:    Managing Director

**SELLER:**

DLUBAK CORPORATION

By: _____
Name:    Frank Dlubak
Title:    President

**[Signature page to Asset Purchase Agreement]**

**SCHEDULE 1**
**LIENS**

1. UCC filed in favor of The Huntington National Bank at No. 2010062203526 on 6/22/2010

2. UCC filed in favor of Farmers & Merchants Bank of Western Pa at No. 2007103008715 on 10/29/2007 & continuation statement.

3. UCC filed in favor of The Huntington National Bank at No. 2010072001277 on 7/20/2010

4. UCC filed in favor of First Commonwealth Bank at No. 2008192647 on 11/24/2008 in Indiana County, and mortgage filed at No. 2008-192645 on November 24, 2008 and No 2008112502689 filed on 11/24/08 with PA Dept. of State

5. UCC filed in favor of Wells Fargo Bank at No. 2010061503141 on 6/15/2010 and 2008032105919 on 3/21/08.

6. UCC filed in favor of Nissan Motor Acceptance Corp. at No. 2010061102076 on 6/11/2010

**SCHEDULE 2(a)(xx)**
**PERMITS**

**SCHEDULE 2(a)(xxi)**
**OTHER ASSETS**

**SCHEDULE 3(b)(i)**
**CURRENT ASSET TARGET**

Anticipated value of cash, cash equivalents, accounts receivable and raw materials inventory (raw materials inventory to be calculated at book value) is $1,750,000.00.

**SCHEDULE 3(c)**
**PURCHASE PRICE ALLOCATION**

**SCHEDULE 5(b)(i)**
**BIDDING PROCEDURES**

(See attached Order of Court dated August 23, 2013)

**SCHEDULE 7(d)**
**CONTRACTS**

1. United Steelworkers collective bargaining agreement originally entered into in 2007 and revised and renewed until September 15, 2013

2. Lease with Motor Truck PacLease for vehicles for $ 4,783 per month

3. Lease with Ryder Transportation Services for $ 4,084 per month

4. Lease with Nissan Motor Acceptance Corp. of forklifts for $ 2,295.58 per month

5. Lease with The Huntington National Bank for 2012 Toyota Prius for $ 530 per month

6. Lease or rental of equipment with Ross Welding Supplies

**SCHEDULE 7(g)**
**LITIGATION**

Quality Support LLC v. Dlubak Corp., 2703 of 2013, collection complaint filed in Westmoreland County, PA

Schmidt Supply v. Dlubak Corp. MJ-40303-CV-072-2013, judgment obtained before district magistrate in Indiana County, PA on July 25, 2013

Scott Electric v. Dlubak Corp., MJ-10210-CV-0000217-2013, collection complaint filed in Westmoreland County, PA

Gentile & Associates Inc. v. Dlubak Corp. et al, MJ 36303-CV-0000095-2013 judgment obtained before District magistrate in Beaver County, PA

**SCHEDULE 7(j)**
**EMPLOYEE BENEFIT PLANS**

**SCHEDULE 7(k)**

**TAXES**

**SCHEDULE 7(l)**

**ENVIRONMENTAL MATTERS**

**SCHEDULE 7(N)**

**ADDITIONAL RISKS/LIABILITIES**